Argued November 17, 1937; reversed January 11, 1938

# STATE *v.* COATS
(74 P. (2d) 1102)

In Banc.

*Bruce Spaulding*, District Attorney, of Dallas, and Ralph E. Moody, Assistant Attorney General (I. H. Van Winkle, Attorney General, on the brief), for the State.

*Walter L. Tooze*, of Portland, and George R. Bagley, of Hillsboro (John Steelhammer, of Salem, on the brief), for respondent.

BELT, J. The defendant Coats is charged with the crime of promoting and setting up a lottery in Polk county by means of a certain device commonly known as a pinball game.

In the information filed by the district attorney it is alleged as follows:

"That said C. C. Coats, on the 23d day of August, 1937, in said county of Polk, State of Oregon, then and there being, did then and there wrongfully, unlawfully and feloniously promote and set up a certain lottery for money by then and there promoting, setting up and operating a certain device commonly known as a pin-ball game for money, which pin-ball game involved an element of skill, but in the playing of which the element of chance predominated, and which pin-ball game and the manner and method of its play is particularly described as follows: The cabinet of said pin-ball game had and has a flat horizontal top in the shape of a table approximately 18½ inches wide and 42 inches long and is mounted on four legs, with one end of the table a little lower than the other. The table legs are capable of being adjusted so as to alter, to some extent, the elevation or incline of the playing surface of the table. A game is played upon said table with a marble or metal ball. The playing surface on the top of the table, which top is protected by a glass cover, has a number of holes numbered from 1 to 16 inclusive, and into which the marble or metal ball used in playing the game may lodge. Springs and resilient pins are driven

into the surface of the playing board at various places and particularly upon the upper side of each of said holes. Beneath the playing surface of said board was and is a receptacle for holding a marble or metal ball and a device for the purpose of raising said marble or metal ball from said receptacle and placing the same in front of a plunger located within and upon said game on the lower righthand corner thereof and which said plunger was and is adapted, designed and devised so that when pulled back and released it will strike said marble or metal ball and force the same along a channel on the righthand side of said board toward the upper or higher end of said board and onto the playing surface of said game. At the upper end of said game and extending upward at right angles to the playing surface was and is a cabinet showing numbers from 1 to 16 inclusive and which numbers correspond to the numbered holes upon the playing surface of said board; and in said cabinet at the upper end of said board there is an electrically controlled revolving drum containing a series of numbers from 2 to 30, and which numbers determine the number of nickles or 5 cent coins of the United States of America given as an award upon the successful playing of said game, these awards for successful playing of such game changing with each play thereof. In addition to the holes on the playing surface of said board numbered from 1 to 16 inclusive, there are three other holes on said board described as follows: One hole in approximately the center of the playing surface of said board is marked 'Left at Post'; another hole directly below the hole marked 'Left at Post' is marked 'Daily Double', and the third hole at the bottom of the playing surface of said board is marked 'Parlay Purse', and at the extreme lower end of said playing surface of said board is a receptacle to receive said marble or metal ball in the event the same fails to drop in one of the holes on the playing surface of said board. Said game is named by the manufacturer thereof as 'Pamco Parlay'. In playing said game the player thereof is required to deposit a nickel in money in a slot or chute located on the lower lefthand corner of said game, and said player places said

game in play by pushing said coin chute forward containing said nickel as aforesaid, and which operation drops said marble or metal ball into said receptacle under the playing surface of said board and enables the player, by the use of a lever on the lower righthand corner of said game, to raise said marble or metal ball to said channel on the right side of said game, and in front of said plunger as aforesaid. The player then propels the marble or metal ball onto said playing board by the use of said plunger as aforesaid, attempting in the use of such plunger and the degree of force applied thereby to cause the marble or metal ball when shot forward onto the playing surface of said board to drop in one of said holes numbered or named as aforesaid, and particularly to avoid said marble or metal ball dropping in said hole marked 'Left at Post' as described. If said marble or metal ball drops in one of said holes numbered as aforesaid, then the player thereof received as his award therefor the number of nickels indicated on said electrically controlled drum opposite the number on said cabinet corresponding to the numbered hole on the playing surface of said board into which said marble or metal ball has dropped. In the event the marble or metal ball drops in said hole marked 'Daily Double' the player receives an award of ten nickles or 50c in money; and in the event said marble or metal bal drops in the hole marked 'Parlay Purse' the player receives an award of ten nickels or 50c in money. The holes marked 'Daily Double' and 'Parlay Purse' are not indicated upon said cabinet at the upper end of said board, and the odds do not change as to these holes, the award for the marble or metal ball dropping in each of said holes being the same in all cases. In the event the marble or metal ball drops in the hole marked 'Left at Post' the player receives no award and loses the game, and in the event the marble or metal ball fails to drop in any other hole on the playing surface of said game the player receives no award and loses the game. In the playing of said game the player is permitted to play but one shot with one ball for the five cents paid by him as consideration for the playing of said game, and only one player can play

said game at a time. In the event the player causes said marble or metal ball to drop in any of said numbered holes, or in said two specifically named holes as aforesaid, the award which the player receives is paid in nickel coins of the United States of America, and said coins are caused to be automatically delivered to the player in a coin-delivery box at the lower end and bottom of said game. In the playing of said game the speed, course and direction of said marble or metal ball, and the hole on the playing surface of the board into which said marble or metal ball may drop, if any, is controlled to a certain degree by the skill of the player, but is determined principally by chance, and in the playing of said game the element of chance predominates over the element of skill, and the operation of said game constituted and does constitute the promoting and setting up of a lottery for money, contrary to the statutes in such cases made and provided and against the peace and dignity of the State of Oregon.''

From an order sustaining a general demurrer to the information, the State appeals.

The vital question is whether the setting up and operation of the pinball machine particularly described in the information constitutes conducting a lottery within the meaning of the term as defined by this court.

Section 4 of Article XV of the Constitution of Oregon provides as follows:

''Lotteries and the sale of lottery tickets, for any purpose whatever, are prohibited, and the legislative assembly shall prevent the same by penal law.''

Section 14-801, Oregon Code 1930, in reference to setting up or promoting lotteries, provides:

''If any person shall promote or set up any lottery for money or other valuable thing, or shall dispose of any property of value, real or personal, by way or means of lottery, or shall aid or be in any way concerned in setting up, managing, or drawing such lottery, or shall, in any house, shop, boat, shed, or building owned

or occupied by him or under his control, knowingly permit, or suffer the setting up, management, or drawing of any such lottery, or the sale of any lottery tickets, share of a ticket, or any writing, token, or other device purporting or intended to entitle the holder or bearer thereof, or any other person, to any prize or interest or share thereof, to be drawn in any lottery, such person, upon conviction thereof shall be punished by imprisonment in the penitentiary not less than six months nor more than one year, or by imprisonment in the county jail not less than three months nor more than one year, or by fine not less than $100 nor more than $1,000.''

The State contends that the operation of this mechanical device involves all the elements of a lottery, and that any statute or ordinance purporting to authorize the licensing of the same is in violation of the Constitution and, hence, of no force or effect.

The defendant contends that, since the pinball game, under the allegations of the information, involves an element of skill, it cannot, under the law, be deemed a lottery. The defendant further asserts that, before any game can be said to constitute a lottery, ''pure chance'' as distinguished from ''dominating chance'' must be involved. In the instant case, it is alleged that the course of the marble ball ''is controlled to a certain degree by the skill of the player.'' Hence, defendant contends, the playing of the game does not involve ''pure chance'' and therefore cannot be a lottery.

There is quite a divergence of opinion among the courts of the various jurisdictions as to what constitutes a lottery. It is not easy to reconcile all that this court has said on the subject. Since this court has, at some length, repeatedly reviewed the various definitions of a lottery, we see no occasion to do so again. Suffice it to say, we adhere to the definition given in the last expression of this court, speaking through Mr.

Justice RAND, in *State v. Schwemler*, 154 Or. 533, 538 (60 P. (2d) 938):

"* * * any scheme whereby one, on paying money or other valuable thing to another, becomes entitled to receive from him such a return in value, or nothing, as some formula of chance may determine."

This definition was taken from Bishop on Stat. Crimes (2 Ed.) § 952, and is quoted with approval in *Quatsoe v. Eggleston*, 42 Or. 315 (71 P. 66), and in *National Thrift Association v. Crews*, 116 Or. 352 (241 P. 72, 41 A. L. R. 1481). The term "lottery" has no technical meaning but, as said by Mr. Justice ROBERT S. BEAN in *Quatsoe v. Eggleston*, supra, courts adopt the generally accepted definition in popular use. Like fraud, it is difficult to define a lottery with any degree of certainty.

Some courts take a broad view of the term while others take the somewhat restricted view that a lottery is confined to a device or scheme which has broad social consequences and amounts to what some say is a "widespread pestilence." No doubt this feature gave rise to prohibitory legislation against the operation of lotteries but, in our opinion, a scheme or device may constitute a lottery even though it does not amount to a "widespread pestilence." It is well known that Chinese lotteries are sometimes operated behind barred doors and only those persons are admitted who pass the eagle-eyed scrutiny of the lookout man. It is the character of the gambling plan or scheme which determines whether it constitutes a lottery, rather than its widespread evil consequences or the number of persons who participate therein. Be that as it may, the courts may be assumed to know what everybody knows and we have no hesitancy in saying that various types of slot machines have become a "widespread pestilence." Some of these mechanical bandits may be

found throughout the state in many stores, restaurants, pool rooms and hotels, appealing to the gambling instinct of a gullible public.

■ To say that the operation of pinball machines or slot machines involves any substantial degree of judgment or skill severely strains the credulity of any reasonable-minded person. Such machines are constructed to win and they do win. In a game involving skill or judgment, the player has a fair opportunity to win. Such opportunity is not afforded the player who "bucks" a slot machine or a pinball machine. No judgment or skill which the player may exercise has any appreciable effect upon the result. It is, to all intents and purposes, a matter of chance.

The information twice draws the legal conclusion that the operation of the pinball machine involves an element of skill, but that, in playing it, the element of chance predominates. The only attempt to allege any fact in support of this conclusion is the following:

"In the playing of said game, the speed, course, and direction of said marble or metal ball, and the hole on the playing surface of the board into which said marble or metal ball may drop, if any, is controlled to a certain degree by the skill of the player * * *.''

When this language is scrutinized in connection with the detailed description of the device and its operation, it is almost as though one should describe with particularity the manner in which a game of roulette is played and then conclude by stating that the result of the game was controlled by the skill of the player.

The device described in the information is a table with a playing surface approximately three and one-half feet long and one and one-half feet wide. Cut into this surface are nineteen holes, of which eighteen are

"pay" holes and the other, designated as "Left at Post," is not.

Springs and resilient pins are driven into the surface of the playing board at various places, and particularly upon the upper side of each of the holes. The table is tilted and, at the lower end, from which the ball used is started, is a receptacle into which the ball may fall when it has run its course. The object, so far as the player is concerned, is to get the ball into one of the eighteen pay holes. If he is successful, he receives a reward greater than the nickel which he pays for the privilege of playing; if he is unsuccessful, he receives nothing.

The player sets the ball in motion by pulling a plunger and then releasing it, and it may be inferred from the allegations of the information that the further back the plunger is pulled the greater will be the force applied to the ball and, consequently, the greater its speed. The ball then travels along a channel on the right-hand side of the board to the further or upper end, where it enters the playing surface. Here it encounters hazards. It may miss all the holes and all the springs and resilient pins and go directly into the receptacle in the lower end; it may drop into a hole, pay or otherwise, avoiding the pins and the springs; or its journey may be interrupted by a collision with a spring or pin, so that it is buffeted about from spring to pin and from pin to spring, to find a resting place, finally, in a pay hole, the "Left at Post" hole, or the receptacle at the lower end.

It is perfectly obvious from the information that the only act which the player can, by possibility, perform to influence the result of this operation is to pull back the plunger a greater or lesser distance and, thereby, in its initial stages, regulate the speed of the

ball. He can send the ball to the playing surface at greater or lesser speed, but he cannot guide or influence its course after it gets there. He cannot aim at anything, as in a game of billiards, or baseball or golf, but is absolutely limited by the mechanics of the device to propelling the ball along the so-called channel to the upper end of the table.

If it be conceded that an exceptional person might, after long practice, develop such proficiency in the business as to be able on occasion to influence the result of the play in any substantial or perceptible degree, yet it is apparent that, so far as the patronizing general public is concerned, it involves nothing more than mere chance. Thus, while we do not consider that we are at liberty to ignore the allegation respecting the control exercised by the player, we are bound to give to it only the meaning and importance to which it is properly and legitimately entitled in the setting where we find it. So viewed, we think that if that allegation does not in fact contradict the plain implication arising from the description of the mechanics of the device and the manner of its operation, it nevertheless fades into legal and practical insignificance in that atmosphere.

 Three things are necessary to constitute a lottery, viz, prize, chance and consideration: *State v. Schwemler,* supra; *Multnomah County Fair Ass'n v. Langley,* 140 Or. 172 (13 P. (2d) 354); *Johnson v. McDonald,* 132 Or. 622 (287 P. 220); *National Thrift Ass'n v. Crews,* supra; *National Sales Co. v. Manciet,* 83 Or. 34 (162 P. 1065, L. R. A. 1917D, 485); *Quatsoe v. Eggleston,* supra; *Fleming v. Bills,* 3 Or. 286, decided in 1871. If any substantial degree of skill or judgment is involved, it is not a lottery. Of course, all forms of gambling involve prize, chance and consideration, but not all forms of gambling are lotteries. A lottery is a scheme

or plan, as distinguished from a game where some substantial element of skill or judgment is involved. Poker, when played for money, is a gambling game but, since it involves a substantial amount of skill and judgment, it cannot reasonably be contended that it is a lottery. In the instant case the mechanical device is the means of carrying into execution the illegal scheme or plan. Tested by the legal principles above stated, we are convinced that the mechanical device described in the information constitutes a lottery.

■ In our opinion, the pinball machine described in the information is a type or form of slot machine and must be judged by the law applicable to it. Both are mechanical schemes or devices that come within the definition of lotteries as set forth in *State v. Schwemler,* supra.

The instant case is closely analogous to *Fleming v. Bills,* supra. In that case defendant was accused of having conducted a scheme or game operated by means of dice and a box containing prizes. The box was divided into 48 different compartments, some of which contained prizes. If the player threw dice bearing a number corresponding to the number of the compartment containing a prize, he was a winner; otherwise, the player received nothing. The court held the scheme to be a lottery, as the throwing of dice is "wholly a matter of chance," and that such scheme involved no skill.

■ According to the weight of authority the operation of slot machines and similar gambling devices, whereby small amounts are hazarded on the chance of winning larger sums, constitutes lotteries: *State v. Barbee,* 187 La. 529 (175 So. 50); *State v. Lowe,* 178 N. C. 770 (101 S. E. 385); *Commonwealth v. Plissner* (Mass.), 4 N. E. (2d) 241; *Johnson v. State,* 137 Ala. 101 (34 So.

1018) ; *Loiseau v. State,* 114 Ala. 34 (22 So. 138, 62 Am. St. Rep. 84) ; 38 C. J. 299. See cases in note 101 A. L. R. 1126.

■ Having held that the operation of the pinball machine in question constitutes a lottery and is in violation of the Constitution, it follows that chapter 369, Oregon Laws 1935, providing:

"That municipal corporations and counties be and they hereby are empowered to license, limit, regulate, impose a privilege tax or charge upon or prohibit pin ball games, dart games, and other games of like character involving an element of skill."

insofar as it purports to authorize the licensing of the same, is of no force and effect.

■ No doubt the able and conscientious trial judge in sustaining the demurrer to the information was influenced largely by the general allegation that the player exercised some skill in the operation of the pinball machine, but, as we have heretofore endeavored to show, it is our opinion that the information, when considered in its entirety, does not warrant such conclusion.

The decree of the lower court sustaining a demurrer to the information is reversed and the cause remanded for further proceedings.

BEAN, C. J., and RAND and LUSK, JJ., concur.

---

KELLY, J. (specially concurring). The writer is of the opinion that the information is not subject to demurrer and, therefore, he concurs in the result reached by the majority opinion.

The writer thinks that the information charges the crime of promoting and setting up a lottery and that it also charges the crime of conducting, maintaining and using a nickel-in-the-slot machine.

The writer cannot concur in holding that the information does not expressly admit that the operation and playing of the machine described therein involves a substantial amount of skill on the part of the player.

In the opinion of the writer the question is whether the "pure chance" doctrine should be applied or the "dominant chance" doctrine should prevail.

We are not called upon to hold that a Chinese lottery is not a lottery because it is sometimes operated behind barred doors. The question before us is whether a pinball machine cannot be or become a lottery because skill on the part of the player affects to a certain degree the result of the game. The circuit court decided that question adversely to the State.

The State has appealed to this court from the decision. The State insists that the information herein charges the crime of promoting and setting up a lottery for money. The defendant challenges that assertion; and bases his challenge upon the statement in the information to the effect that the award of prizes is controlled to some extent by the skill of the player; and hence, as defendant claims, because such award is not the result of pure chance the machine is not a lottery.

The trial courts of the state are at a variance upon the question. This court has been upon both sides of it.

In that state of the record, the writer takes this occasion to say that, in deference to the importance of the question, its effect upon the commonwealth, the present embarrassment to the district attorneys, the trial courts and the office of the attorney general, because the question is unsettled, this court should now and here decide it. The question is whether the information charges the crime of promoting and setting up a lottery for money. That was the question argued in the trial court, that was the question argued in the su-

preme court, and until that question is settled varying and divergent views thereon will be declared by the trial courts and the administration of justice will suffer in the esteem and confidence of the people.

The contest between the State and the defendant in the lottery case has been centered upon whether the "pure chance" doctrine should be applied or the dominent chance doctrine should prevail.

The "pure chance" doctrine is that one of the essential elements of a lottery is that the selection and award of the prize must be determined by pure chance in which man's choice or will has no part and which is undeterminable by human reason, foresight, sagacity or design until the same has been accomplished.

In his brief, defendant frankly states that this "pure chance" doctrine is enunciated by the minority of courts and known as the "minority view", but he urges that the minority view is based upon sound reasoning and logic.

*People v. Elliott,* 74 Mich. 264 (41 N. W. 916, 3 L. R. A. 403, 16 Am. St. Rep. 640), cited to this point is a case wherein a conviction was affirmed. It is obvious that the affirmance of a conviction in a case, wherein the award was made by pure chance, is not tantamount to a holding that in a case, wherein there was an element of skill but chance predominated, a conviction could not be affirmed.

*Hall v. Cox,* [1899] 1 Q. B. Div. 198 (68 L. J., 2 B. 167), and *Brown v. Bonnycastle,* [1936] 1 D. L. R. 295, also cited by defendant, are English and Canadian cases.

*Lee et al. v. City of Miami et al.,* 121 Fla. 93 (163 So. 468, 101 A. L. R. 1115), a suit to restrain the licensing of machines, and *Ex parte Pierotti,* 43 Nev. 243

(184 P. 209), are also cited by defendant. We will discuss these two cases later herein.

Although defendant cites *Public Clearing House v. Coyne,* 194 U. S. 497 (48 L. Ed. 1092, 24 S. Ct. 789), the writer thinks that it declares the majority view. We quote from it:

"The return to the subscribing member, which is called a realization, is not only uncertain in its amount, but depends largely upon the number of new members each subscriber is able to secure, as well as the number of members which his co-operators are able to secure. The return to members who have been able to secure a large number of other members, and to pay their own monthly dues, may be very large in comparison with the amount paid in, but the amount of such return depends so largely, and, indeed almost wholly, upon conditions which the member is unable to control, that we think it fulfills all the conditions of a distribution of money by chance."

*Douglas v. Kentucky,* 168 U. S. 488 (18 S. Ct. 199, 42 L. Ed. 553), holds that legislative enactments granting the privilege of operating lotteries are not contracts and may be abrogated by subsequent legislative actions.

Except the citations to Oregon constitutional, statutory and judicial authority, the foregoing cases comprise all those cited by defendant to the point that the minority view is based upon sound reasoning and logic.

To the writer, it is plain that this court has announced both the minority and majority rules. The following Oregon cases are determinative of that fact: *Quatsoe v. Eggleston,* 42 Or. 315 (71 P. 66); *National Sales Co. v. Manciet,* 83 Or. 34 (162 P. 1055, L. R. A. 1917D, 485); *National Thrift Assn. v. Crews,* 116 Or. 352 (241 P. 72, 41 A. L. R. 1481); *Johnson v. McDonald,* 132 Or. 622 (287 P. 220); *Multnomah County Fair Assn. v. Langley,* 140 Or. 172 (13 P. (2d) 354);

and *State v. Schwemler*, 154 Or. 533 (60 P. (2d) 398. No good purpose would be served by analyzing and comparing these cases. Suffice it to say, that the Quatsoe-Eggleston case, *supra*, is understood by text writers as declaring the minority rule.

There is no controlling reason why this court should be out of harmony with the consensus of judicial opinion as reflected by the majority of the courts of the United States. By it we are told that even though the element of skill enters into the determination of who shall win, if the element of chance is the predominating, determinative factor then the award is one of chance, and, where the other elements comprising a lottery are present, the conduct and operation thereof is within the inhibition against lotteries.

The English and Canadian courts adhere to the minority view: *Scott v. Director of Public Prosecutions,* 6 Brit. Rul. Cas. 765, [1914] 2 K. B. 868, 83 L. J. K. B. 6 N. S. 1025, 111 L. T. N. S. 59, 78 J. P. 267, 30 Times L. R. 396; *Hall v. Cox,* supra; *Stoddart v. Sager,* [1895] 2 Q. B. 474; *Caminada v. Hulton,* 17 Cox Cr. L. C. 307; *Barclay v. Pearson,* [1893] 2 L. R. Ch. Div. 154; *Rex v. Ying Foy* (B. C. 11 West L. R. 246; *Queen v. Parker,* Vol. IX Man. 203; *Dunham v. St. Croix Soap Mfg. Co.,* 34 N. B. Rep. 243; *Regina v. Jamieson,* 7 Ont. 149; *Regina v. Dodds,* 4 Ont. 390; Archbold Crim. Plead. (1900) p. 1,441; *Brown v. Bonnycastle,* supra. For this reason we do not discuss the English and Canadian cases cited by defendant.

The majority view is reflected in the following cases: *State v. Barbee* (La.) 175 So. 50; *Public Clearing House v. Coyne,* supra; *United States v. McKenna,* 149 Fed. 252; *Waite v. Press Pub. Assn.,* 155 Fed. 58 (85 C. C. A. 576, 12 Ann. Cas. 319, 11 L. R. A. (N. S.) 609); *People v. Lavin,* 179 N. Y. 164 (71 N. E. 753, 66

L. R. A. 601, 1 Ann. Cas. 165) ; *Stevens v. The Cincinnati Times-Star Co. et al.* (3 cases) 72 Ohio St. 112 (73 N. E. 1058, 106 Am. St. Rep. 586) ; *Lewis v. State,* 55 Ga. App. 159 (189 S. E. 566, 28 Cin. L. Bul. 235) ; *Main v. Mackey,* 21 Pa. Dist. 1142 (39 Pa. Co. 589) ; *State v. Vasquez,* 49 Fla. 126 (38 So. 830) ; *Com. v. Plissner* (Mass.) 4 N. E. (2d) 241; *People v. Babdaty,* 139 Cal. App. 791 (30 P. (2d) 634, 635) ; *State ex rel. Prout v. Nebraska Home Co.,* 66 Nev. 349 (92 N. W. 763, 103 Am. St. Rep. 706, 60 L. R. A. 448, 1 Ann Cas. 88; *El Debate Inc. v. Topacio,* 44 Philippine Rep. 278.

"From an examination of the later cases, both federal and state, it appears to have become the established American doctrine that, in order to constitute a lottery within the meaning of the various statutes, it is not necessary for the distribution of prizes to be purely by chance, but only for such distribution to be by chance as the dominating element, even though affected to some extent by the exercise of skill or judgment." Excerpt from section 12, Vol. 17, R. C. L., Subject: Lotteries, p. 1225.

It was suggested by defendant's attorney upon oral argument that a lottery is neither a game nor a sport, but merely a scheme and, hence, that the maintenance of a pinball machine cannot constitute the conduct and setting up of a lottery. This argument overlooks the fact that the maintenance and operation of the machine constitutes the means of carrying out the scheme which includes the payment of a nickel for a chance to win a larger sum as a prize by operating the machine which is the method of determining who may and who may not win a prize.

"The term 'lottery' has a double meaning. It includes not only a scheme for the distribution of prizes by chance, but the distribution itself * * * * *." Vol. 2. Wharton's Criminal Law (13th Ed.), Sec. 1777.

Defendant's brief frankly admits, however, that this court is committed to the rule that there may be a lottery without a drawing and without tickets.

The following are some of the cases in each of which the maintenance of some machine has been held to constitute the crime of conducting a lottery: *State v. Barbee,* supra; *Johnston v. State,* 137 Ala. 101 (34 So. 1018); *Reeves v. State,* 105 Ala. 120 (17 So. 104); *Ex parte Gray,* 23 Ariz. 461 (204 P. 1029); *City of New Orleans v. Collins,* 52 La. Ann. Rep. 973 (27 So. 532); *State v. Lowe,* 178 N. C. 770 (101 S. E. 385, 387); *State v. Vasquez,* supra; *Commonwealth v. Ward,* 281 Mass. 119 (183 N. E. 271); *Loiseau v. State,* 114 Ala. 34 (22 So. 138, 62 Am. St. Rep. 84); *Prendergast v. State,* 41 Tex. Cr. App. 358 (57 S. W. 850); *Com. v. Plissner,* supra; *Queen v. State,* 93 Tex. Cr. App. 173 (246 S. W. 384).

Defendant also urges that to adopt the majority rule upon the element of chance, as distinguished from "pure chance" being a requisite, is to classify all gambling as lotteries; and it is argued that this course is contrary to the attitude of the constitution makers, who, being well-informed citizens, knew that a distinction existed between lotteries and other forms of gambling and that this distinction was and is reflected in the various statutes prohibiting certain gambling games independently of the statute condemning lotteries.

It must be conceded that lotteries constitute a form of gambling. Whatever mechanical device is used by which the prize is drawn or awarded is a gambling device.

It is argued that the territorial statutes in force distinguished between lotteries and other gambling by applying the test of chance or pure chance in the method of award. If the award were made by chance, the de-

vice or scheme was the usual or common form of gambling; but if made by "pure chance" then the scheme or device constituted lottery.

We find no such distinction in the territorial statutes. It is true that lotteries were prohibited by a statute specifically naming them: Chapter VIII, Laws of Oregon, 1853, p. 206; Chapter VIII, Statutes of Oregon, 1855, p. 229. It is likewise true that by the terms of the general anti-gambling statute (Chapter X, ibid, pp. 208 and 231, respectively):

"*All* E. O. or rolette tables, faro or faro banks, and all gaming with cards, gaming tables or *gambling devices whatever*" were "prohibited from being set up or used for gaming or gambling purposes" in the territory. (Italics supplied.)

It is apparent that, then as now, lotteries were included in the all-embracive terms of the general anti-gambling statutes. It is equally apparent that the chance or pure chance doctrine could not then, as it cannot now, correctly distinguish a lottery from an ordinary form of gambling. Roulette wheels, dice games, and the first nickel-in-the-slot machines in general use are all devices whereby the award is made without the influence of skill or foresight and yet that alone does not transform these gambling agencies into lotteries, and, certainly, neither the territorial nor the present statutes reflect such a phenomenon.

The supreme court of the United States has indicated a distinction between lotteries and other forms of gambling. In the Nevada case of *Ex parte Pierotti,* supra, which supports the minority view discussed herein and is cited by defendant, the distinction thus indicated by the highest federal court is adopted. The Nevada court in the Pierotti case, supra, does not say that the distinction between lotteries and other forms

of gambling is to be found in the holding that pure chance must be shown to have controlled the award in lotteries, while in other forms of gambling it need only to be shown that chance dominated the award. On the contrary, the Nevada court very clearly states the distinction which attends irrespective of whether the "pure chance" or the chance doctrine is applied.

We quote from the Nevada case:

"It is true that in common parlance, in a dictionary sense and the statutory definition, the word 'lottery' may be a game. But the Legislature of this state, since the date of its organization as a state, has plainly drawn a distinction between lotteries and unlawful gaming. This distinction is universally recognized as being within the power of such bodies to make in the absence of any constitutional inhibition. Both are offenses against the law, and both are offenses against public policy. *Temple v. Commonwealth,* 75 Va., 901. The reason for the distinction is not difficult to find. A lottery is prohibited by the Constitution as a public nuisance—a crime against the good order and the economy of the state. Section 6561, Rev. Laws. It is a crime that goes to the destruction of the morals of the people and paralyzes the industrial energy of society. From the language employed in the Constitution it is evident that this was the understanding of its framers. *Ex parte Blanchard,* 9 Nev. 104. 'It is this extensive reach, and not merely its speculative purposes which makes lottery gambling so dangerous' as to be a proper subject for constitutional prohibition. The reason for the distinction is forcibly expressed by the highest court of the land in this language: 'The suppression of nuisances injurious to public health or morality is among the most important duties of government. Experience has shown that the common forms of gambling are comparatively innocuous when placed in contrast with the widespread pestilence of lotteries. The former are confined to a few persons and places, but the latter infests the whole community; it enters every dwelling; it reaches every class; it preys upon the hard earnings

of the poor; it plunders the ignorant and simple. *Phalen v. Commonwealth'*, 8 How. 163, 12 L. Ed. 1030.

"It is true that lotteries and unlawful gaming partake of the same mischief. They belong to the same family. Chance is the material element in both. The Legislature is prohibited from legislating upon one and permitted by virtue of its inherent powers to legislate upon the other as the occasion arises. This for the reason of the wide distinction or contrast between the vice of lotteries, which infests the whole community, and the mischief or nuisance of gaming, which is generally confined to a few persons and places." *Ex parte Pierotti,* supra.

We also quote the excerpt from *Ex parte Blanchard* to which reference is made in the foregoing quotation from *Ex parte Pierotti*:

"By statute 10 and 11, W. III, c. 17, all lotteries are declared to be public nuisances. 4 Bl. Com. 168. This statute remained in force in England at the time of the declaration of American Independence, and being applicable to our situation, constitutes a part of the common law of the United States. From the language employed in the constitution, it is evident that this was the understanding of its framers." *Ex parte Blanchard,* 9 Nev. 101, 105.

It is not necessary to advert to the holdings in sister jurisdictions in order to find a recognition of this distinction between lotteries and other forms of gambling. It is announced in *Ex parte Kameta,* 36 Or. 251 (60 P. 394, 78 Am. St. Rep. 775), and plainly repeated by Mr. Justice RAND in *State v. Schwemler,* supra, which is the latest expression of this court upon the subject.

Bearing in mind that *Phalen v. Commonwealth,* supra, was decided in December, 1849, and that the Oregon constitutional convention was held in 1857, it is obvious that the members of the convention were

familiar with the distinction there made between lotteries and other forms of gambling.

Earlier in this opinion, we adverted to the case of *Lee et al. v. City of Miami et al.,* supra, designating the nature of the case and saying that later herein we would further discuss it. The reason for this further discussion is that we are impressed with the emphasis given by this Florida case, cited by defendant to the "widespread pestilence" test of what constitutes a lottery.

This Florida case was brought to restrain the licensing of certain types of coin-operated devices under the provisions of chapter 17257, Acts of 1935, Laws of Florida, subdivision 2 of section 2 of which refers specifically to "Coin operated skill machines (commonly referred to as Pin-games, Marble Tables, and similar devices of this type which may have a skill feature.)"

We quote from the opinion:

"What section 23 of Article III [Const. of Fla.] actually did was not to suppress such legalized lotteries as are referred to in the fore part of this opinion, the primary test of which was whether or not the vice of it infected the whole community or country, rather than individual units of it. Any gambling device reaching such proportions would amount to a violation of the Constitution but it is not alleged or shown that the devices legalized by Chapter 17257 [Fla. Stat.] comes in this class.

"Chapter 17257 on its face does not clearly offend against organic law nor do the coin operating vending machines described in Section 2, the use of which is restrained, constitute lotteries per se. *It may be that some of them or possibly all of them in their operation will become such; but we leave that question to be determined when a specific case arises.*" (Italics supplied.) *Lee et al. v. City of Miami, et al.* supra.

In the first edition of his "Statutory Crimes", Mr. Bishop made the distinction between lotteries and other sorts of gaming thus,—

"* * * it is now seen that they" (lotteries) "are an evil both by the wholesale and retail, while the other sorts of gaming are merely evils of the retail." Bishop on Statutory Crimes, § 951.

It is true that in subsequent editions the above quoted phrase was superseded by—

"* * * their evils were immense; both in the woes inflicted on the weak-minded and credulous, who were induced to buy chances in them, to be followed by bitter disappointment; and in their baneful effects on those termed 'lucky' who drew the prizes." Bishop on Statutory Crimes, 2nd and 3rd Editions, § 951.

In the writer's view, "wholesale and retail" evil and immensity of evil are synonomous with "widespread pestilence."

Mr. Wharton says:

"* * * When, however, the community at large is entitled to come in, a new and very serious objection springs up. Independently of the opportunity for fraud by the managers of such enterprises, their publication imparts an excited spirit of gambling to the public generally. On the one side, often ensue gross cases of deception as to the scheme itself; on the other, the sacrifice of savings by the ignorant and credulous, and excitement, destruction of regular industry, often inducing insanity. It is to suppress that species of lottery, we should remember, that the lottery statutes are aimed. The test, therefore, as to any scheme for the distribution of property by chance, is, Is it private or public." 2 Wharton's Criminal Law, 11th Ed., p. 1945, Sec. 1776.

These recognized authorities on criminal law express the view that the reason for the law prohibiting

lotteries is that they are, or are capable of becoming, widespread in their evil effect. To the writer it is axiomatic that if the game, device or scheme is not within the reason of the rule, it is not within the rule itself.

As to the widespread pestilence of pin board operations, we need only heed the argument made by defendant's attorney in order to conclude that the operation of these gambling devices has become widespread and pestilential. In his argument, defendant's attorney advised the court that these pinball games were in operation in practically every city and county in the state. As citizens, we know that until recently their operation was general and that the patrons and players were very numerous and were comprised of all classes.

The only case exactly in point coming to our attention is *State v. Barbee,* supra. It is argued that, because the constitution of Louisiana not only prohibits lotteries but also enjoins upon its legislature the duty to pass laws suppressing gambling, this case is not in point. That case, nevertheless, expressly holds that a pinball machine is a lottery and the writer is in accord with that holding, subject to proof of its character as producing or being capable of producing or imparting "an excited spirit of gambling in the public generally."

The writer concurs in holding that the demurrer to the information herein should have been overruled.

Mr. Justice Rossman concurs in the foregoing specially concurring opinion.

---

BAILEY, J. (specially concurring). The information does not refer specifically to any criminal statute, although both the appellant and the respondent in their briefs assume that an attempt is made to charge the defendant with the crime of promoting and setting up

a lottery for money, in violation of § 14-801, Oregon Code 1930. The discussion in the briefs of the parties does not seem to have any particular reference to the language of that section of the code, but the argument is devoted principally to what in general constitutes a lottery.

Section 4 of article XV of the constitution of Oregon, which has not been altered since the time of its adoption, is as follows:

"Lotteries and the sale of lottery tickets, for any purpose whatever, are prohibited, and the legislative assembly shall prevent the same by penal laws."

Following the adoption of the constitution the legislature in 1864 enacted the code of criminal procedure, which code included the provisions as to lotteries and gambling to which attention is now directed. Section 644 of that code, which has remained unamended since its enactment and is still unchanged except as to punctuation in succeeding compilations, is now codified as § 14-801, *supra,* reading thus:

"If any person shall promote or set up any lottery for money or other valuable thing, or shall dispose of any property or value, real or personal, by way or means of lottery, or shall aid or be in any way concerned in setting up, managing, or drawing such lottery, or shall, in any house, shop, boat, shed, or building owned or occupied by him or under his control, knowingly permit, or suffer the setting up, management or drawing of any such lottery, or the sale of any lottery tickets, share of a ticket, or any writing, token or other device, purporting or intended to entitle the holder or bearer thereof, or any other person, to any prize, or interest or share thereof, to be drawn in any lottery, such person, upon conviction thereof, shall be punished by imprisonment in the penitentiary, not less than six months, nor more than one year, or by imprisonment in the county jail not less than three months, nor more than

one year, or by a fine not less than one hundred, nor more than one thousand dollars.''

Section 645 of the 1864 code of criminal procedure has likewise remained unaltered since its adoption and is now § 14-802, Oregon Code 1930. It is thus worded:

''If any person shall sell, either for himself or another, or shall offer for sale, or shall have in his possession with intent to sell or offer for sale, or to exchange or negotiate, a ticket or share of a ticket in any such lottery, or any writing, token, or other device as is mentioned in section 644 [14-801], such person, upon conviction thereof, shall be punished by imprisonment in the county jail not less than three months nor more than one year, or by fine not less than fifty dollars, or more than five hundred dollars.''

The next succeeding section of the 1864 criminal code, 646, has also remained on the statute books without change since its adoption. It is now codified as § 14-803, Oregon Code 1930, and prohibits the advertising for sale of lottery tickets or any other writing, token or other device mentioned in § 14-801, *supra*.

The foregoing provisions were included in chapter XLIX of the 1864 code of criminal procedure under the general heading, ''Crimes against public policy''. The same code in chapter L, the general heading of which is ''Of Gaming'', includes § 666, providing as follows:

''All gambling devices of whatever name or nature, adapted, devised or designed for the purpose of playing any game of chance for money, property or other valuable thing, or any representative thereof, are prohibited from being set up, kept, used, exhibited, opened, dealt, played or practiced in this state.''

Section 667 of the 1864 criminal code provides as follows:

''If any person shall allow, suffer or permit, any gambling device prohibited by section 666 to be set up,

kept, used or exhibited for the purpose of gaming, in any house, building, shed, booth, boat, shelter, lot or premises to him belonging or by him occupied or rented, or of which he has at the time the possession or control, such person, upon conviction thereof, shall be punished by imprisonment in the county jail, not less than three months, nor more than one year, or by fine not less than three hundred dollars, nor more than one thousand dollars.''

.The code of criminal procedure ''was prepared and reported to the legislative assembly, that met September 12, 1864, by M. P. Deady. It was passed at the same session'' and took effect from and after the first day of May, 1865: Code of Criminal Procedure 1864, page 441, note. Judge Deady was the president of the constitutional convention and it is significant that he, in drafting this code, and the legislature, in enacting it, distinguished between lotteries and certain gambling devices involving an element of chance.

The code of 1853, which has often been referred to as the first code of Oregon, was prepared by three commissioners elected by the territorial legislature of 1852-1853. The commissioners were James K. Kelly of Clackamas county, Reuben P. Boise of Polk county and Daniel R. Bigelow of Thurston county. Both Mr. Boise and Mr. Kelly served as members of the legislative assembly which adopted this code, Mr. Boise as a member of the house of representatives and Mr. Kelly as a member of the upper branch of the legislature. In the interim between the appointment of the commissioners and the meeting of the territorial legislature, an act had been passed by Congress organizing the territory of Washington, and that necessarily prevented Mr. Bigelow, of Thurston county in that territory, from becoming a member of the Oregon legislative assembly: Oregon Historical Society, Vol. IV, page 184. Both

Mr. Kelly and Mr. Boise were also members of the constitutional convention.

In chapter VIII of the 1853 code, under "Offenses against public policy", lotteries and the setting up or promoting of lotteries are defined in substantially the language found in our present code. Chapter X, under the title of "Gaming", provides in part as follows:

"Section 1. All E. O. or rolette tables, faro or faro banks, and all gaming with cards, gaming tables or gambling devices whatever, are hereby prohibited from being set up or used for gaming or gambling purposes in this territory."

Section 2 of the same chapter provides:

"Every person who shall deal cards at the game called faro, or forty-eight, whether the same shall be dealt with fifty-two, or any other number of cards, and every person who shall keep to be used in gaming, any gambling device whatever, designed to be used in gaming, shall forfeit the same on conviction, and be punished by fine not more than one hundred nor less than fifty dollars."

Section 7 of article XVIII of the constitution of this state provides that "all laws in force in the territory of Oregon when this constitution takes effect, and consistent therewith, shall continue in force until altered or repealed." By virtue of this provision of our organic law, the sections in the 1853 code relating to lotteries and gaming were continued in force until the criminal code of 1864 became operative. The legislature in 1864 re-enacted in substance the territorial laws as to lotteries, but in re-enacting the territorial law against gaming it enlarged that law and included in general terms "all gambling devices of whatever name or nature adapted or designed for the purpose of playing any game of chance for money".

In the footnote to § 644 of the 1864 criminal code printed in 1865 and the footnote to the same section in General Laws of Oregon 1845-1864, compiled and annotated by Matthew P. Deady and printed in 1866, we find reference to three decisions. The footnotes were undoubtedly intended to explain the meaning and application of the language used in that section of the code. The first case therein mentioned is *Governors of the Alms House v. American Art Union,* 3 Selden (7 N. Y.) 228, which was an action brought by the plaintiffs as overseers of the poor of the city of New York to recover from the defendants a penalty of $300, which was three times the value of a picture offered by the defendants as a prize in a lottery. After referring to a number of definitions of the word "lottery" the court there said:

"The scheme in question has all the attributes and elements of a lottery. It is a distribution by lot of a small number of prizes among a great number of persons. The prizes and blanks are drawn in the manner in which prizes are drawn in other lotteries. The certificate of membership is a ticket which entitled the holder to a chance for a prize of much greater value than the price of the ticket."

*Bell v. State,* 5 Sneed (37 Tenn.) 507, is the next case cited in the two footnotes. In that instance the defendant was convicted of the crime of gaming. In the opinion therein it is said:

"Gaming is an agreement between two or more, to risk money on a *contest* or *chance* of any kind, where one must be *loser* and the other *gainer.* Some games depend altogether upon skill, others upon chance, and others are of a mixed nature. Billiards is an example of the first, lotteries of the second, and backgammon of the last. 2 Bouv. Law Dic. 553. A lottery is a game of hazard, in which small sums are ventured for the chance of obtaining greater."

The court further stated that the scheme employed was "a rare and novel device for winning and losing, and ... ingeniously contrived to evade the laws against gaming and lotteries". It was held that the defendant was guilty of gaming, but it does not appear whether or not gaming included lotteries.

The third case mentioned in the footnotes is *Den ex dem. Wooden v. Shotwell*, 4 Zab. (24 N. J. L.) 789, which involved a drawing of lots to determine which tracts of land should be acquired by various purchasers of the land who participated in the scheme. In the opinion the court asked, among others, the following question: "Was it not the hope of obtaining, through the mere agency of chance, a valuable house and lot, or a lot much exceeding in value the sum of money promised to be paid?" The opinion thus continued:

"If the plan was thus originated and executed, it was a contrivance for the distribution of prizes by chance; a reliance upon the result of hazard; a decision of the values of the adventurers' investments by the favors of fortune. * * * The whole contrivance was a lottery transaction, and is directly in the face of the provisions of a statute of our state."

Not long after the enactment of the Oregon code of criminal procedure, this court, in *State v. Mann*, 2 Or. 238, ruled that § 666 of that code, hereinabove set out, on which the indictment therein was based, was unconstitutional, on the ground that the statute was uncertain and did not enumerate or define the gambling devices which it undertook to prohibit. In that connection the court stated:

"A crime or public offense is some act forbidden by law; and it is a well-settled rule of law that no one can be punished for doing an *act*, unless it clearly appears that the *act* sought to be punished comes clearly within both the spirit and the letter of the law prohib-

iting it. The act constituting the offense should be clearly and specifically described in the statute, and with sufficient certainty, at least to enable the court to determine, from the words used in the statute, whether the act charged in the indictment comes within the prohibition of the law. Do the provisions of the statute in question do this? Can the court ascertain from all the words used in it, without resorting to evidence, what a gambling device is? We think not, because the term has no settled and definite meaning. It is nowhere defined in the code, nor has it any common-law definition. For these reasons, we think, section 666 of the code of criminal procedure has failed to give a sufficient description of gambling devices to enable the court to determine, with certainty, what was intended to be prohibited by the legislature, and is, therefore, void.''

After the court had declared § 666 of the 1864 criminal code unconstitutional, the legislature in 1868 passed an act to prevent and punish gambling (Laws 1868, page 15), of which the general features are the same as those of the act passed in 1876 (Laws 1876, page 39), which latter statute still remains in effect, unamended. Section 1 of the act is now codified as § 14-739, Oregon Code 1930. The 1868 enactment is found in chapter IX of the Deady & Lane General Laws of Oregon, 1843-1872. By express language it purports to repeal § 666 of the 1864 criminal code. The reason, apparently, for re-enacting in 1876 the statute which had previously been passed is contained in the footnote in the Deady & Lane code, indicating that there was some question as to whether the 1868 act had ever become effective, "because the assembly of 1868 never formally adjourned but on October 28 took a recess until March 4, 1869, and did not meet afterwards." Section 1 of the act passed in 1876 (now § 14-739, *supra*) is as follows:

"Each and every person who shall play, carry on, open or cause to be opened, or who shall conduct either

as owner, proprietor, or employee, whether for hire or not, any game of faro, monte, roulette, rouge-et-noir, lanquenet, vingt-un (or twenty-one), poker, draw poker, brag, bluff, thaw, or any banking or any other game played with cards, dice, or any other device, whether the same be played for money, checks, credits, or any other representative of value, shall be guilty of a misdemeanor, and upon conviction thereof shall be punished by a fine of not more than $500, and shall be imprisoned in the county jail until such fine and costs are paid; provided, that such person so convicted shall be imprisoned one day for every $2 of such fine and costs; and provided further, that such imprisonment shall not exceed one year."

This act contains thirteen sections, all of which, except the section repealing an earlier act and the one declaring an emergency, remain unaltered and in full force. By way of added penalty the act also provides that all persons losing money or anything of value "at or on any of said games" may recover from the dealer or player winning the same, twice the amount of money or double the value of the thing lost. It is made the special duty of the sheriff, district attorney, constable and police officers to inform against and diligently prosecute all persons "whom they shall have reasonable cause to believe guilty of a violation of the provisions of this act." The act expressly repeals the 1868 statute.

After the passage of the act of 1868 and before the enactment of the 1876 law, during its January term of 1871, the circuit court of Multnomah county in *Fleming v. Bills,* reported in 3 Or. 286, in a *habeas corpus* proceeding, discussed at some length the question of what constitutes a lottery. There, the statement of facts shows, the defendant was charged with violation of the statute prohibiting lotteries. His offense was described as "conducting a scheme or game operated by means

of dice and a box containing prizes. The box was divided into compartments; these compartments were numbered from eight to forty-eight inclusive. Some of these compartments contained prizes; others were empty or blank. The game was played by means of eight dice thrown by the person who chose to pay the specified sum for the chance of winning a prize. If such person threw a number corresponding with the number of a compartment containing a prize, he became entitled to a prize contained in that compartment, otherwise he received nothing." In discussing whether or not the device operated by the defendant was a lottery, the court stated:

"The constitution of the state prohibited lotteries and the sale of lottery tickets, and the statute makes a violation of this clause of the constitution punishable as a felony; other games of chance forbidden by statute are declared misdemeanors."

The opinion then lists various definitions of the word "lottery" as given by courts, text writers and dictionaries, and refers to and briefly describes the Genoese or numerical and the Dutch or class lotteries. Two of the definitions are taken from *Bell v. State,* supra, and *Governors of the Alms House v. American Art Union,* supra, and the following is from Bouvier's Law Dictionary and Webster's Dictionary: "A scheme for the distribution of prizes by chance." From Bishop on Criminal Law this definition is taken: "A game wherein a person paying money becomes entitled to money, or some other thing of value, on contingencies, to be determined by lot cast by the managers of the game." The decision was that the device employed by the defendant constituted a lottery, inasmuch as "the result," the court found, "of a fair throw of the dice is wholly a matter of chance."

156

In January, 1868, Judge Deady, in *United States v. Olney*, 27 Fed. Cas. 233, case No. 15,918, which involved the federal law taxing lotteries, decided that the scheme there in question was a lottery. The opinion states that that case "is in almost every respect a counterpart of the celebrated case of the American Art Union, decided in New York in 1852," which precedent we have hereinabove mentioned. Holding that the scheme there operated by the defendant for the distribution of town lots was a lottery, Judge Deady variously defined "lottery" as follows:

"The word 'lottery' is defined and used as follows by lexicographers and writers: 'A distribution of prizes and blanks by chance; a game of hazard, in which small sums are ventured for the chance of obtaining a larger value either in money or other articles.' Worcest. Dict. 'A disposition of prizes by lot or chance.' Webst. Dict. 'A scheme for the distribution of prizes by chance.' Bouv. Dict. 'A kind of game of hazard, wherein several lots of merchandise are deposited in prizes for the benefit of the fortunate.' Rees. Cyclopaedia. 'A sort of gaming contract, by which, for a valuable consideration, one may by favor of the lot obtain a prize of a value superior to the amount or value of that which he risks.' Am. Cyclopaedia. 'That the chance of gain is naturally over-valued, we may learn from the universal success of lotteries.' Smith, Wheat. Nat. bk. 1, c. 10.

"All these authorities agree that where there is a distribution of prizes—something valuable—by chance or lot, this constitutes a lottery. But the definitions from Worcester and the American Cyclopaedia are the most complete. From each of these it expressly appears that a valuable consideration must be given for the chance to draw the prize."

In 1871 this court, in the case of *State v. Dougherty*, 4 Or. 200, was called upon to determine the sufficiency of an indictment charging the defendants with setting up and managing a lottery for money. The indictment

itself, after naming the defendants, stated that they were accused by the grand jury of Multnomah county, Oregon, "by this indictment, of the crime of aiding and being concerned in setting up and managing a lottery for money, committed as follows". The indictment then stated that the defendants, naming them, on a certain day, in Multnomah county, Oregon, "did unlawfully and feloniously aid and were concerned in setting up a lottery for money, contrary to the statute."

After directing attention to section 11 of article I of the constitution of Oregon, to the effect that a defendant has a right "to demand the nature and cause of the accusation against him, and to have a copy thereof", and citing § 69 of the criminal code (now §13-703, Oregon Code 1930), to the effect that in a criminal action the indictment must contain "a statement of the acts constituting the offense, in ordinary and concise language, without repetition, and in such manner as to enable a person of common understanding to know what is intended", this court held that the indictment was insufficient to meet those requirements of the constitution and the criminal code. The opinion pointed out the necessity of complying with the statute, and continued:

"Under the provisions of the section of our statute before referred to, prohibiting lotteries, there is special reason for particularity and certainty in the indictments so far as 'the nature and cause of the accusation' are concerned, for the reason that the lawmaker has conferred great latitude upon the courts in imposing the penalty for the violation of such law; the punishment ranging all the way from a fine of one hundred dollars to imprisonment in the penitentiary. It was evidently the object of the legislature to embrace within the purview of this section all the multifarious lottery schemes in vogue, from the most magnificent, and there-

fore most dangerous to the welfare of society, down to the most trifling in character and results. It is with this view evidently that the penalty is graded as we find it; and where such is the case it becomes more important to disclose in the indictment (for the reason already stated) the nature of the particular transaction complained of.''

In 1899 the legislature passed an act to prohibit the maintaining, operating, conducting, playing or using of nickel-in-the-slot machines or other devices of like character, involving the use of dice, cards or any substitute therefor, wherein there enters any element of chance (Laws 1899, page 250). Two years later, in 1901, the legislature enacted a law (Laws 1901, page 66), the first four sections of which are now §§ 14-746 to 14-749, inclusive, Oregon Code 1930. The title of the act is as follows: ''An act to prohibit the maintaining, conducting, operating, playing or using nickel-in-the-slot machines or other devices of like character wherein there enters any element of chance.''

Section 5 of the act repeals all acts or parts of acts in conflict therewith; and § 6 provides that, ''inasmuch as there is some doubt as to the validity of the law of February 24, 1899 [the 1899 enactment above mentioned], covering the same subject-matter, and inasmuch as the moral sentiment of the state demands this enactment in the interest of the youth of the state, and that the law shall be effective at once, this act shall be operative from and after its approval by the governor.''

Section 1 of the act (§ 14-746, *supra*) provides as follows:

''Any person or persons who shall conduct, maintain, or operate, either as owner or owners, proprietor or proprietors, lessee or lessees, employee or employees, agent or agents, or who shall play or use any nickel-in-the-slot machine or other device of like character

wherein there enters any element of chance, whether the same be played for money, checks, credits, or other thing or representative of value, shall be guilty of a misdemeanor, and upon conviction shall be punished by a fine of not less than $10 nor more than $100, and in default of payment of the fine imposed shall be imprisoned in the county jail one day for each $2 thereof.''

The language used in the information in this case clearly charges the defendant with violation of § 14-746, *supra*, referred to as the nickel-in-the-slot-machine statute. That statute is not limited in its application to nickel-in-the-slot machines exclusively or to any particular form of slot machines, but covers all other machines or devices of like character in the operation of which an element of chance enters, when such machines or devices are played for money or other representative of value. The machine or device which the defendant is charged with maintaining and conducting is operated by placing a nickel in the slot. According to the information, chance preponderates, and therefore there is ''an element of chance'' in the operation of the machine. Obviously, from the facts stated in the information, it is played for money. It is apparent from reading this section of the code that the legislature did not intend to limit the scope of the act to any one type of machine or device, but attempted by the passage of this act to eradicate the evils attendant upon the operation and maintenance of such mechanical gambling contrivances.

Section 14-746, *supra,* describes more aptly than does any other of our criminal statutes the machine or device which the defendant is charged with maintaining and operating. It was enacted with the legislative intent of covering particularly the kind of gaming with which the defendant is charged.

In the following cases it was held that pinball games, or, as sometimes termed, marble machines, were gaming machines or devices within the ban of the respective statutes of the jurisdictions in which the decisions were rendered: *Houghton v. Fox,* (Tex Civ. App.) 93 S. W. (2d) 781; *Redd v. Simmons,* 175 Miss. 402 (167 So. 65); *Howle v. Birmingham,* 229 Ala. 666 (159 So. 206); *Steed v. State,* 189 Ark. 389 (72 S. W. (2d) 542); *Milwaukee v. Burns,* (Wis.) 274 N. W. 273. In *State v. Barbee,* 187 La. 529 (175 So. 50), the supreme court of Louisiana held that the operation of a nine-ball marble table constituted a lottery. The organic law of that state provides that "gambling is a vice and the legislature shall pass laws to suppress it", and that "lotteries and the sale of lottery tickets are prohibited in this state."

Section 9-215, Oregon Code 1930, admonishes us that, "In the construction of a statute the intention of the legislature . . . is to be pursued, if possible". With that purpose in mind, we have referred to the laws in force in the Oregon territory at the time the constitution was adopted, prohibiting gaming, and in particular those referring to certain types of gambling and the conducting and maintaining of lotteries; the continuance of those laws in force by express provision of the constitution, until altered or repealed; the distinction observed by the territorial legislature and by the state legislature between lotteries and forms of gaming involving an element of skill; the early ruling of this court that "no one can be punished for doing an *act,* unless it clearly appears that the *act* sought to be punished comes clearly within both the spirit and letter of the law prohibiting it", and declaring § 666 of the code of criminal procedure unconstitutional because the gambling devices therein prohibited were not sufficiently

described by the statute (*State v. Mann,* supra) ; the later holding by this court that because of the scope of our lottery statute, and the latitude allowed the courts in imposing sentences for violation thereof, there was "special reason for particularity and certainty in the indictments so far as 'the nature and cause of the accusation' are concerned" (*State v. Dougherty,* supra) ; and many other matters forming the historical background of the existing laws relating to gaming.

The statute which prohibits the setting up or promoting of lotteries (§ 14-801, *supra*) does not in any way attempt to define what a lottery is. When it came to making unlawful playing at or conducting certain games, both the territorial and the state legislature deemed it necessary to enact a law specifically defining the games which were intended to be prohibited: § 14-739, *supra.* Later, in 1899 and 1901, because of the detrimental effect upon the youth of the state resulting from playing slot machines, the legislature enacted the nickel-in-the-slot machine statute (§ 14-746, *supra*), apparently deeming the existing laws relating to lotteries and certain gambling games not sufficiently comprehensive to cover maintaining and using slot machines.

In addition to these laws the 1864 criminal code contained § 659 (now § 14-722, Oregon Code 1930), commonly known as the nuisance statute. That law has been invoked when the act complained of is not prohibited by some other criminal statute: *Multnomah County Fair Association v. Langley,* 140 Or. 172 (13 P. (2d) 354).

From the various definitions quoted and the numerous decisions hereinabove cited it is apparent that there is no well-settled definition of the term "lottery". In recent years considerable controversy has arisen in

various jurisdictions in determining whether to constitute the playing of certain machines a lottery there must be an absence of skill and the playing must be governed entirely by chance. Other courts take the view, regarded as the dominant one, that where chance predominates, whether there be slight or substantial skill involved, the playing or conducting of the device, scheme, game or contrivance constitutes a lottery, if the other essential elements of a lottery, namely, consideration and reward, are also present.

Some of the courts go so far as to hold that even though chance predominates and there are involved the other essential elements, consideration and reward, nevertheless, in order to constitute a device or scheme a lottery, the use of such device or scheme must be of such a nature as to create a "widespread pestilence". As was said in the brief of the district attorney and the attorney general, "It appears from reading the Oregon cases that an attribute of all lotteries is the 'wide-spread pestilence' referred to in the foregoing quotation." The quotation mentioned is an excerpt from the decision of the United States supreme court in *Phalen v. Virginia,* 49 U. S. 163 (12 L. Ed. 1030), set forth in *Ex parte Kameta,* 36 Or. 251 (60 P. 394, 78 Am. St. Rep. 775). It would therefore appear from many of the authorities that in order to convict a defendant charged with maintaining and conducting a lottery it would be necessary not only to prove beyond a reasonable doubt that in the act with which he is charged chance predominated but also that the scheme or contrivance which he was maintaining or conducting was, or was susceptible of becoming, a "wide-spread pestilence".

Our statute prohibiting lotteries does not define what constitutes setting up and maintaining a lottery.

In addition to this statute we have in this state other laws which, although they do not define them as gambling, prohibit certain acts which in their nature constitute gambling as that term is generally understood: §§ 14-739 and 14-746, Oregon Code 1930. These latter laws specifically mention the games, schemes and devices which are prohibited and provide penalties for violation of the statutes.

In *State v. Schwemler*, 154 Or. 533, 535 (60 P. (2d) 938), it is said:

"Most gambling games, however, are not lotteries and, therefore, are not included within the constitutional prohibition. The distinction between the ordinary forms of gambling and a lottery was recognized by the framers of the constitution by prohibiting the enactment of any law legalizing lotteries and by making no reference whatever to other forms of unlawful gaming. The distinction was also recognized by the legislature in defining what shall constitute unlawful gaming and in prescribing a different punishment for the offense of promoting a lottery from that prescribed for unlawful gaming."

Decisions from other jurisdictions defining what does or does not constitute a lottery must be read in connection with the laws of the respective states from which they emanate. Our attention has not been directed to any adjudication from another jurisdiction wherein the court has held that a certain course of action constituted setting up and maintaining a lottery, where such course of action was prohibited and penalized by some other statute than the one prohibiting lotteries. Were it not for the fact that we have in this state a statute specifically prohibiting setting up and maintaining nickel-in-the-slot machines and providing punishment therefor, there might be reason to hold that the legislature intended to include in the law pro-

hibiting lotteries the act with which the defendant here is charged.

A number of states have held that certain gaming is or is not a lottery, depending upon whether or not it has become a "wide-spread pestilence". There is no reason, however, in this state to apprehend that the patronage or use of nickel-in-the-slot machines such as the one which the defendant is charged with setting up and operating would ever attain such proportions, because their use and operation are prohibited by statute, and it is to be supposed that officials of the state who are in charge of enforcing the law will prevent any widespread or general use of such machines or devices.

The information in this case charges the defendant with "setting up and operating a certain device commonly known as a pin ball game for money, which pin ball game involved an element of skill, but in the playing of which the element of chance predominated". It then describes the manner and method of playing such game and concludes by stating that: "In the playing of said game the speed, course and direction of said marble or metal ball, and the hole on the playing surface of the board into which said marble or metal ball may drop, if any, is controlled to a certain degree by the skill of the player, but is determined principally by chance, and in the playing of said game the element of chance predominates over the element of skill . . ." The contention is made that, taking the information as a whole, the facts therein stated conclusively show that the skill used in playing the game is negligible and not substantial. Some of the definitions given in Funk & Wagnall's Dictionary for "substantial" are: "Of or pertaining to substance; having real existence; not

fictitious; as, a figment of the imagination without *substantial* being.'' It seems impossible to arrive at the conclusion that the information does not charge that there is a substantial amount of skill involved in playing the pinball game therein described. The positive language stating that the speed, course and direction of the marble or metal ball and the hole on the playing surface of the board into which the ball may drop are controlled to a certain degree by the skill of the player cannot be ignored; and this court cannot say as a matter of law that the skill of the player has no real existence, or that it is fictitious.

But even if it could be said, in spite of the allegations in the information, that the element of skill employed in playing the game is not substantial, the question of whether or not it was substantial would still be left for the jury to decide on the trial of the case. To hold that any game which involves a substantial element of skill does not constitute a lottery is in effect to adopt the pure chance doctrine as distinguished from the predominating chance theory.

It is, however, unnecessary here to determine whether in order to constitute a device or machine a lottery within the meaning of § 14-801, *supra*, the pure chance theory or the predominating chance theory be adopted and applied, or to determine whether or not the conducting and maintaining of the device with which the defendant is charged is, or is susceptible of becoming, a ''wide-spread pestilence'', for the obvious reason that the crime with which the defendant is here charged is one specifically prohibited by the nickel-in-the-slot machine statute, § 14-746, *supra*. By accusing him of violating this section of our code the conviction of the defendant is made certain and simple, if in fact he is

guilty of conducting, maintaining or operating a device therein prohibited. On a trial under that section it is only necessary to prove that there enters into the playing of the device any element of chance and that the device is played for money or other thing of value.

If we are to pursue the intention of the legislature in the instant case, we must conclude that it was intended that any one guilty of the crime with which the defendant is charged must be prosecuted under the provisions of § 14-746, *supra*. It surely was not the intention of the legislature that the defendant could be prosecuted under both the lottery act and the nickel-in-the-slot machine statute, or that of numerous offenders guilty of similar acts some might be prosecuted under a statute making the violation thereof a felony, while others could be charged with the violation of some other statute making the crime charged a misdemeanor. To attribute such a purpose to the legislature would tend to create distrust in and disrespect for the administration of our criminal law.

As hereinbefore stated, the indictment does not accuse the defendant specifically of violating any particular statute. In *State v. Jarvis*, 18 Or. 360 (23 P. 251), this court said: "The name given to the crime with which the pleader sought to charge the defendant in the indictment is rape, but it seems a mistake in this particular; is an irregularity and is not fatal. The charging part of the indictment must be looked to, to determine the character of the offense." In *State v. Sweet*, 2 Or. 127, it was observed: "It was necessary to set out the facts in the indictment so that the proof would correspond with the facts charged; and if these facts charged describe the crime as defined by statute, it is sufficient, and the calling the offense embezzlement

in the caption of the indictment does not constitute a variance from the definition given by the statute." See also: *State v. Taylor*, 50 Or. 449, 452 (93 P. 252); *State v. Emmons*, 55 Or. 352, 357 (104 P. 882, 106 P. 451); and *State v. Briggen*, 112 Or. 681 (231 P. 125). The information in this case was sufficient to charge the defendant with a violation of the provisions of § 14-746, *supra*.

For the foregoing reasons I concur in holding that the demurrer to the information should have been overruled. My concurrence, however, is based on the fact that the information charges a violation of § 14-746, known as the nickel-in-the-slot machine act, rather than § 14-801, Oregon Code 1930.