STATE of Iowa ex rel. Zigmund CHWIRKA, Appellee,

v.

Joseph AUDINO, Frank Audino, the Aventino Enterprises, Inc. d/b/a Aventino Motor Inn and Convention Center, Allan J. Larson, J. M. Griffin, Gold Nugget Co., Inc., and the Security National Bank of Sioux City, Iowa, Appellants.

No. 59119.

Supreme Court of Iowa.

Nov. 23, 1977.

W. M. Forker, Sioux City, for appellants.

Zigmund Chwirka, County Atty., Sioux City, for appellee.

Heard by MOORE, C. J., and RAWLINGS, REES, UHLENHOOP and McCORMICK, JJ.

REES, Justice.

Defendants, except defendant Security National Bank, are the owners and operators of a gambling house in Sioux City known as Aventino Motor Inn and Convention Center. They appeal trial court's grant of a permanent injunction enjoining defendants from permitting gambling on their premises upon a finding that a nuisance as defined by § 99.1, The Code, existed. We affirm.

On September 3, 1975 the State of Iowa, on the relation of the Woodbury county attorney, filed a petition for a temporary injunction pursuant to § 99.6, The Code. In the petition, plaintiff claimed that except for defendant bank the Aventino Motor Inn and Convention Center was owned and operated by the defendants and was being used as a gambling house which was a nuisance under § 99.1, The Code, 1975. Plaintiff further claimed that such operation of the premises did not come under any of the exceptions of § 99.1, of chapter 99B or § 726.12 of the 1975 Code of Iowa as amended. Therefore, plaintiff asked the court to restrain the defendants from removing furniture and fixtures which were used in the gambling operations, and sought a permanent injunction restraining the defendants from the use of the premises for gambling operations. On the basis of the petition, the trial court ordered the issuance of a temporary injunction.

Defendants by way of answers either generally denied the allegations of the petition or asserted as an affirmative defense that gambling on the premises was allowed under the statute and cited § 99B.7 in particular for justification.

At the hearing before the trial court, certain exhibits were introduced, including various liquor licenses for the operations of the Aventino Motor Inn by defendant Gold Nugget Co., Inc. (hereinafter Gold Nugget), and the licenses granted by the Department of Revenue of the State of Iowa which allowed the defendant Gold Nugget to conduct as a qualified organization, "bingo games, raffles, games of chance as defined by Iowa Law" at the Aventino Motor Inn under a temporary permit. Also introduced were the rules for playing various games which were conducted under the license such as craps, blackjack and roulette.

The parties agreed and stipulated as to the substance of the testimony of several witnesses. They stipulated that Duane Lynch, if called, would testify to the following facts: Lynch was a special agent for the Division of Vice Enforcement for the Department of Public Safety for the State of Iowa, that on several occasions during the month of August, 1975 he went into the Aventino Motor Inn and found games such as blackjack and craps were being played on the mezzanine level of the premises, that on each visit Lynch purchased chips and played blackjack, and afterwards went

downstairs where he exchanged his chips for gold nuggets which were then exchanged for cash; that on one occasion when he cashed in his chips he was given the choice of receiving cash or gold nuggets. Lynch was also present on the premises at the two times when it was raided and various gambling paraphernalia such as blackjack tables were seized by the enforcement officers.

It was also stipulated that Police Officer Russell White, if called, would testify that he witnessed gambling going on at the Aventino Motor Inn and participated in a police raid in which various gambling devices were seized and Allan Larson was arrested. Larson was the president of Gold Nuggett, which was the operator of the Aventino Motor Inn and the gambling activities which were taking place there. Also the parties agreed that Duane Lynch, Frank O'Keefe, Russell White, Jr., and Robert Widner would testify that the Aventino Motor Inn had a reputation for conducting gambling activities.

Under another stipulation it was agreed that Allan Larson, if called, would testify that his company was the owner of the Aventino Motor Inn and was a completely separate entity from Northwest Territories, Gold and Silver Exchange Corporation of Minneapolis, Minnesota (hereinafter Northwest), that Gold Nuggett bought chips in an arm's-length transaction with Northwest, that Gold Nuggett used the chips in the operation of its games at the Aventino Motor Inn, and that the chips were redeemable for .999 fine gold by Northwest in its office located in the lobby of the Aventino Motor Inn. The agreed testimony of Larson would also support the fact that the posted game rules and the limitations of the amount of money which could be placed on a single game were all in accordance with the Iowa statute.

It was also stipulated that Samuel Pepper, if called, would describe the games being played on defendants' property, and it was agreed Lorna Anderson would state she worked for Northwest and redeemed chips coming from the Gold Nugget only

for gold at the Aventino Motor Inn and did not give the customers a choice between gold or cash. She also stated that after delivery of the gold, she could purchase the gold for cash.

On the basis of the evidence introduced, the trial court ordered the issuance of a writ of permanent injunction. The court enjoined the defendants from the use of the Aventino Motor Inn for gambling purposes, and found there was adequate evidence that the Aventino Inn was being used by some of the defendants for gambling purposes and, therefore, was a nuisance as defined under § 99.1 of the 1975 Code of Iowa. In connection with this determination, the court also found the operations did not fall within the exemptions as provided in § 99.1. Such determination forms the basis of this appeal.

The trial court enjoined the defendants on the basis of § 99.1, The Code, which states:

"99.1 Houses of prostitution or other nuisances. Whoever shall erect, establish, continue, maintain, use, own, or lease any building, erection, or place used for the purpose of lewdness, assignation, prostitution or gambling, or pool selling as defined by section 726.6 is guilty of a nuisance, and the building, erection, or place, or the ground itself, in or upon which such lewdness, assignation, prostitution, or gambling, or pool selling as defined by section 726.6 is conducted, permitted, or carried on, continued, or exists, and the furniture, fixtures, musical instruments, and movable property used in conducting or maintaining such nuisance, are also declared a nuisance and shall be enjoined and abated as hereinafter provided.

"The provisions of this section shall not apply to games of skill, games of chance, or raffles conducted pursuant to chapter 99B or to devices lawful under section 99B.10 or to games lawful under section 726.12."

As provided in the last paragraph of the above section, § 99.1 is not applicable to games of skill, games of chance, or raffles

which are operated in accordance with chapter 99B. The exemptions to § 99.1 provided in chapter 99B which are most relevant to the dispute are the ones provided in §§ 99B.6 and 99B.7.

Section 99B.6 relates to liquor control licensees and the parts relevant to the dispute provide:

"99B.6 Games where liquor or beer is sold.

"1. Gambling is unlawful on premises for which a class "A", class "B", class "C" or class "D" liquor control license, or class "B" beer permit has been issued pursuant to chapter 123 unless all of the following are complied with:

"a. The holder of the liquor control license or beer permit has submitted an application for a license and an application fee of twenty-five dollars, and has been issued a license, and prominently displays the license on the premises. "b. * * * .

"c. Gambling other than social games is not engaged in on the premises covered by the license or permit.
" * * * ."

Section 99B.7 relates to qualified organizations which are basically organizations licensed by the State and which contribute the net proceeds of their authorized gambling operations to charities. The parts of 99B.7 relevant to the dispute provide:

"99B.7 Games conducted by qualified organizations.

"1. Except as otherwise provided in section 99B.8, games of skill, games of chance and raffles lawfully may be conducted at a location specified in subsection 2 of this section, but only if all of the following are complied with:

"a. The person conducting the game or raffle has been issued a license pursuant to subsection 3 of this section and prominently displays that license in the playing area of the games.
" * * * .

"d. Cash prizes shall not be awarded in games other than bingo. The actual retail value of any merchandise prizes shall not exceed twenty-five dollars and may not be repurchased. * * *

"e. Except as provided in paragraph 'd' of this subsection with respect to an annual raffle, the cost to a participant for each game shall not exceed one dollar.
" * * * .

"g. Merchandise prizes are not repurchased.
" * * * .

"2. * * * .

"3. a. A person wishing to conduct games and raffles pursuant to this section as a qualified organization shall submit an application and a license fee of twenty-five dollars. * * *

"b. A person or the agent of a person submitting application to conduct games pursuant to this section as a qualified organization shall certify as a part of that application that the net receipts of all games either shall be distributed as prizes to participants or shall be dedicated and distributed to educational, civic, public, charitable, patriotic or religious uses in this state. * * *

"c. A qualified organization shall distribute amounts awarded as prizes on the day the prizes are won. A qualified organization shall dedicate and distribute the balance of the net receipts not later than one hundred eighty days from the date received. * * *

"4. * * * ."

On the basis of the record and the above cited statutes, the defendants appeal and present the following issues for review:

(1) Whether this court should give weight to the findings of the trial court.

(2) Whether the State made an adequate showing that the defendants' gambling operations were a nuisance under § 99.1 and did not fall under any of its exemptions from its operations.

(3) Whether the various games which were conducted by the Gold Nugget were games of chance as described under § 99B.1(2) which were allowed to be con-

ducted by qualified organizations under § 99B.7.

(4) Whether a beer permittee or a liquor licensee can be a qualified organization to conduct games of skill or chance pursuant to § 99B.7, The Code.

(5) Whether the record evidence shows that the Gold Nugget was not a qualified organization operating pursuant to § 99B.7.

(6) Whether the reputation of the Aventino Motor Inn, testified to as a part of the State's case, was sufficient to establish, *prima facie,* a nuisance as defined in § 99.1.

 I. The first issue for review is whether the court could give weight to the trial court's findings of fact where the record consists of stipulations by the parties and exhibits introduced by the parties. There is no dispute on the proposition that our review of this case is *de novo* since this is an equity proceeding. Rules of Appellate Procedure 4. However, the State contends we should give weight to the trial court's findings of fact, while the defendants assert we must give no weight to the trial court's determination since the case involves only stipulated testimony and exhibits. As support for their position, the defendants cite *State Board of Social Welfare v. Teeters,* 258 Iowa 1113, 1114–1115, 141 N.W.2d 581, 582 and *Ames Trust and Savings Bank v. Reichardt,* 254 Iowa 1272, 1280, 121 N.W.2d 200, 204. However, in those cases we gave no weight to the trial court's findings of fact as the record was not only limited to stipulated testimony but revealed no factual disputes. The cited cases are distinguishable from the present dispute where even though the record consists of stipulated testimony and exhibits there are disputed facts such as whether cash was given to Lynch when he presented his chips for exchange or whether he received gold. Since there are disputes as to the facts involved in this case, we give weight to the trial court's findings of fact, but are not bound by them. However, since the trial court made only a general finding that the gambling operations were a nuisance and did not fall under any of the exemptions from the operation of § 99.1 provided for under

chapter 99B, the finding does not provide much guidance for us in resolving the issues before us.

II. The next issue for our consideration is whether the trial court erred in finding the State met its burden of proof by showing that the defendants' gambling operations were a nuisance and did not fall under any of the statutory exemptions to the operation of § 99.1. The parties do not dispute the proposition that the State has the burden of proof in this case. However, they do differ on whether the State prove that the defendants' operations were a nuisance under § 99.1, The Code. On the basis of our determination of the following issues, we believe that the State carried its burden.

III. The next issue which is presented for review is whether the various games which were conducted by the Gold Nugget were games of chance as described under § 99B.1(2) which were allowed to be conducted by qualified organizations under § 99B.7. The State contends that the games the defendants were conducting on the premises were casino games which the legislature intended not to include in the definition of games of chance. The State reaches such a conclusion on the basis of reading chapter 99B as a whole. The defendants argue that games such as blackjack and craps were games of chance that Gold Nugget, as a qualified organization, was allowed to conduct under § 99B.7.

Section 99B.1(2) gives the following definition of games of chance:

"Game of chance means a game whereby the result is determined by chance and the player in order to win aligns objects or balls in a prescribed pattern or order or makes certain color patterns appear and specifically includes but is not limited to the game defined as bingo. Game of chance does not include a slot machine."

 On the basis of the evidence it is clear the games conducted by the Gold Nugget were games of chance as defined by the statute. There is no indication on the face of § 99B.1(2) that the legislature

meant to exclude casino type games like blackjack, craps and roulette from the definition of games of chance. The only specific items excluded from the definition are slot machines. The failure to include other types of casino games in this exclusion indicates the legislature did not mean to exclude the other games from the definition of games of chance.

■ Neither do we find any indication of legislative intent to exclude casino type gambling from the operations of a qualified owner under § 99B.7 when we look at chapter 99B as a whole. There is nothing in § 99B.7 that prohibits "casino games", or ties that section with any other section such as § 99B.12(2)(a), The Code, which does prohibit casino type games like blackjack, craps and roulette from being played between individuals as social games. Therefore, such prohibitions are not applicable to organizations operating under § 99B.7, in light of § 99B.15 which allows gambling as permitted by a separate section of the chapter.

Since there is nothing in § 99B.1(2) or chapter 99B as a whole which prohibits the conducting of casino type games such as roulette, blackjack and craps by a qualified organization, we hold that the above type games are games of chance which Gold Nugget, as a qualified organization, was allowed to conduct if it met the other requirements for operation as a qualified organization pursuant to § 99B.7.

IV. The next issue we must resolve is whether a beer permittee or a liquor licensee can be a qualified organization which may conduct games of skill or chance pursuant to § 99B.7, The Code. The State claims that Gold Nugget, as a liquor licensee, is limited in its gambling operations by § 99B.6, The Code, which purports to control gambling on the premises of beer permittees and liquor licensees and specifically limits those operations licensed under § 99B.6(1)(a), The Code, to social gambling in which the licensee does not participate or conduct the games. Section 99B.6(1)(c). Since the gambling activity conducted by defendants was not in the form of social games, the gambling operations did not fall under any of the exemptions to § 99.1, and could be enjoined.

On the other hand, defendants claim the limits on liquor licensees provided in § 99B.6 are not applicable to liquor licensees who are licensed qualified organizations under § 99B.7. In other words, the defendants suggest that §§ 99B.6 and 99B.7 should be read separately and that each section gives a licensee under that section certain limited gambling privileges which are not circumscribed by the other section.

■ An examination of the language of chapter 99B suggests to us the legislative intent that §§ 99B.6 and 99B.7 should be read separately, and specifically that § 99B.6 should not be deemed to apply to qualified organizations under 99B.7 who are also beer permittees or liquor licensees. Such legislative intent appears in the language contained in § 99B.15, which provides:

"99B.15 Applicability of chapter. It is the intent and purpose of this chapter to authorize gambling in this state only to the extent specifically permitted by a section of this chapter. Except as otherwise provided in this chapter, the knowing failure of any person to comply with the limitations imposed by this chapter constitutes unlawful gambling, a misdemeanor, which is punishable as provided in chapter 726."

Since the language refers to a section of the statute only, it demonstrates the intent to allow gambling in accordance with an individual section of that chapter and not to require that all sections thereof must be complied with in order for gambling to be lawful. This position is further strengthened by the explanation to the Senate bill which enacted chapter 99B:

"The intent is that gambling is unlawful except as specifically permitted in a given section of chapter 99B. The sections are not intended to overlap, so that each section contains the privilege and the limitations applicable to a given set of circumstances." Senate File 496, 66th G.A. (1975).

The above language clearly fixes the legislative intent that each section should be read separately and would not limit each other. There is another indication in § 99B.7 which shows a legislative intent not to construe §§ 99B.6 and 99B.7 together. Section 99B.7 begins: "Except as otherwise provided in section 10 * * *". If §§ 99B.6 and 99B.7 were supposed to overlap, then § 99B.6 would have been referred to in this opening phrase. Since that section was not included, it indicates the intent not to have § 99B.6 considered in the operation of § 99B.7.

■ On the basis of these reasons, we hold that a liquor licensee who is also a qualified licensee under § 99B.7 is not bound by the limitations contained in § 99B.6, and may conduct gambling pursuant to § 99B.7.

V. We next turn our attention to the question whether the evidence established Gold Nugget was an organization qualified to operate pursuant to § 99B.7. Defendants claim the evidence showed Gold Nugget was such a qualified organization, while the State contends Gold Nugget, since it was not conducting games of chance as defined in § 99B.1(2), was not operating lawfully in accord with § 99B.7, because it was selling liquor on the premises where the gambling operation was being conducted. Further, the State claims the operation was not lawful since Officer Lynch exchanged his chips for cash on the premises in violation of § 99B.7(1)(g). We have held the first and second grounds above urged for noncompliance are not viable. See Divisions III and IV above.

The record reveals the following facts in connection with the prohibited exchange of chips for money. Gold Nugget applied for a license as a purportedly qualified organization under § 99B.7 and stated in its application that all proceeds from its gambling operation would be used for charitable purposes as required by the statute. On this basis, Gold Nugget was granted a temporary license to operate under § 99B.7, and there was no indication that the net profits from the gambling operations were ever used for purposes not allowed under § 99B.7. Gold Nugget bought the gambling chips that were used in its operations in an arm's-length transaction from Northwest which had an office on the ground floor of the defendants' motel. Evidence showed that Gold Nugget and Northwest were completely separate entities. In accordance with the statute, there was no evidence to indicate that Gold Nugget was allowing anyone to wager more than one dollar per game or to win more than $25 in a single game. However, on one occasion Lynch reported that he was able to exchange his chips for gold or cash. The defendants introduced evidence which showed that this exchange took place between Northwest and Lynch, and that Gold Nugget, as the qualified organization, was not involved in this transaction. Employees of Northwest said that they would never allow an exchange of chips for cash directly but exchanged the chips for gold which then they could exchange for cash. On the basis of the above evidence, the parties are in dispute over whether the gambling operations were conducted in accordance with § 99B.7(1)(g), which provides: "Merchandise prizes are not repurchased."

The State claims the above provision was violated when Lynch exchanged the chips received as prizes from the gambling operations for either gold or cash and was ultimately able to get cash for the chips. Defendants assert they did not violate this provision since only gambling chips were given as awards which were exchanged for gold by Northwest Territories. According to defendants, the fact that Northwest might purchase the gold for cash from people who won prizes from the defendants' gambling operations did not put the operations outside the scope of § 99B.7.

■ We conclude defendants did not comply with § 99B.7(1)(g). In this case Gold Nugget, by setting up the arrangement with Northwest in which chips won through its gambling operations could be exchanged for gold which in turn Northwest could repurchase for cash, indirectly provided for the repurchase of merchandise.

It is apparent that Gold Nugget facilitated the repurchase of gold not only by its contractual arrangement with Northwest, but also by allowing Northwest to maintain offices on defendants' premises. The statute's prohibition on the repurchase of the merchandise prizes won in gambling applies to indirect repurchases of the merchandise as well as direct purchases by the qualified owner in order to insure that the legislative intent in preventing the award of cash for the winning of these games is complied with. We interpret the statute as prohibiting the indirect repurchase of merchandise by a qualified organization through the purchase of readily marketable commodities by the qualified owner, and then the qualified owner facilitating their repurchase on his premises by providing for the presence of a third party, as the record indicates was done in this case.

■ Further, we find that Northwest's repurchases of the gold were part of the defendants' plan of gambling operations since the defendants bought chips which were redeemable in gold by Northwest, the defendants knew that Northwest would exchange the gold for cash, and the defendants provided Northwest with space on defendants' premises for conducting such exchanges. These facts all indicate that the defendants' relationship with Northwest existed to facilitate its gambling operations and, in reality, was a part of the same. Since the above activities of Northwest can be viewed as part of defendants' gambling enterprise or as indirect repurchases by Gold Nugget, as the qualified organization, we conclude the defendants violated § 99B.7(1)(g), the statutory requirement that merchandise should not be repurchased.

VI. The final issue presented for review is whether the evidence of the reputation of the Aventino Motor Inn adduced by the State was sufficient to establish a *prima facie* case of a § 99.1 nuisance. The parties stipulated the testimony of various police officers who, if called, would testify the Aventino Motor Inn had a reputation as a gambling house. Newspaper advertisements were also used to show this reputation. The defendants assert that this evidence of reputation does not show noncompliance with § 99B.7.

■ We find that the defendants' position is correct because a reputation for gambling does not necessarily mean noncompliance with § 99B.7 which would make the gambling operation a nuisance under § 99.1. However, because of our decision that defendants' scheme violated the statutory prohibition against repurchases of prizes, this conclusion does not affect the result of the case.

■ As a result of the conclusion reached in Division V that the defendants' gambling operations did not comport with the statutory provision prohibiting a qualified organization conducting a game from repurchasing prizes awarded, Gold Nugget did not operate pursuant to § 99B.7 or any of the other exemptions to the operation of § 99.1. Therefore, the defendant gambling operations constituted a nuisance as defined by § 99.1, The Code, and were properly permanently enjoined by the trial court. The decree enjoining the defendants from conducting their gambling operations is affirmed.

AFFIRMED.