Guy L. CARSTEN, an Individual, Plaintiff and Appellant,

v.

AETNA LIFE INSURANCE COMPANY, a corporation, Defendant and Respondent.

No. 11702.

Supreme Court of South Dakota.

Dec. 16, 1976.

John D. Wagner, of Kandaras & Wagner, Rapid City, for plaintiff and appellant.

Donald R. Shultz, of Lynn, Jackson, Shultz, Ireland & Lebrun, Rapid City, for defendant and respondent.

WINANS, Justice.

This is an appeal from an order granting summary judgment to defendant, Aetna Life Insurance Company. Plaintiff, Guy Carsten, alleges error because a genuine issue of material fact exists that prevents entry of judgment as a matter of law. We agree.

■ We examine the evidence, as we must, in a light most favorable to the non-moving party. *Wilson v. Great Northern Railway Co.*, 1968, 83 S.D. 207, 157 N.W.2d 19. On March 1, 1968 Aetna issued a group policy ( # 58520) to C. P. Clare & Co., Rapid City, South Dakota. On February 10, 1969, plaintiff's wife was employed by C. P. Clare and applied for group coverage on March 1, 1970. Mrs. Carsten went to see Dr. E. T.

Ruud of Rapid City on March 26, 1971; he discovered that she had transitional cell carcinoma of the right frontal sinuses. The records of C. P. Clare show that Mrs. Carsten worked a full day on March 26th and part of the day on March 27, 1971. On March 31, 1971 her termination papers were completed; the form showed that termination was voluntary and by way of explanation stated "Doctor's orders due to illness."

Shortly thereafter Mrs. Carsten completed an application for a life conversion policy which was available under the provisions of the group plan. Although the application was dated April 30, 1971, which would be too late to effectuate a conversion, the premium check was dated April 13. The life conversion policy was later issued effective May 1, 1971 (Policy # N 2,762,690); the policy was for $4,000.00 and listed the plaintiff as beneficiary.

On May 17, 1971 Juliette Theroux, Group Services Department, Fall River, Mass., acknowledged receipt of the conversion application but requested information on the date of cancellation and amount of coverage before processing the conversion. On May 26, 1971 she received the reply from C. P. Clare & Co. listing termination as of March 27, 1971. On June 8th the Fall River office notified the Chicago office that the conversion application was refused because not made within the 31 days allowed by the group policy.

On June 30, 1971 Mr. Carsten sent a letter to Ronald Karlic, Senior Field Underwriter in the Chicago office, asking why he had not received the life conversion policy. He pointed out that the premium check dated April 13th had been cashed. Mr. Carsten also wrote to the claim office in Minneapolis, Minn., submitting medical bills for an operation performed on Mrs. Carsten in Rochester. (The health provisions of the group plan were converted on March 28, 1971—policy # GHC 617040).

On July 17, 1971 Ms. Theroux, responding to an inquiry from Debbie Goralski of the Chicago Life Underwriting office which sought the whereabouts of the life conver-

sion policy, wrote that the application had been denied as not timely and directed the refund of premiums. Ms. Goralski responded on July 19 that April 13 was the proper application date; this prompted Theroux to request a copy of the premium check on August 8, 1971. Finally on August 25, Theroux notified the Chicago office that the conversion application was accepted. The Life Underwriting Department issued the policy September 2, 1971, effective May 1, 1971.

In the meantime Ms. Betty Wagner, Group Claims Dept. in Minneapolis was handling the medical claims. On July 7, 1971 she requested an operative report from Dr. Zanka, who had performed the Rochester operation on Mrs. Carsten. She also informed Mrs. Carsten that she was working on the claim. On August 3, she received some forms she had evidently requested from Mr. Carsten; he also informed her that he was sending two disability reports to Mr. Karlic in Chicago. Ms. Wagner contacted Mr. Karlic on August 12, explaining that a conversion policy was in effect; that Mr. Carsten felt extended benefits might be available under the group plan; and asking for a decision on the availability of extended medical coverage through C. P. Clare & Co. Karlic replied on August 19 that it was not his decision whether extended benefits were available. "I am just a life agent with the Aetna Life agency which handled the conversion of her life insurance policy." He included two doctor's reports: one dated July 20, 1971 from Dr. Kenneth Devine in Rochester, Minn., which stated "Mrs. Carsten is indefinitely disabled . . . "; one dated July 30, from Dr. Ruud which dated disability from March 26, 1971.

Ms. Wagner advised Mr. Carsten of this correspondence on September 2, 1971 and requested a letter from C. P. Clare & Co. on whether there was extended coverage eligibility. She said it was their decision. C. P. Clare & Co. then referred the matter to Clifton Smiley, Claim Coordinator for Group Claims, Elmhurst, Ill. After reviewing the file, he notified C. P. Clare on October 13, 1971 that "we have no choice but to deny any liability for disability benefits." Because he thought March 26 to be the last day of work, as well as the date of disability, he reasoned that total disability did not exist at termination, else Mrs. Carsten could not have worked a full day. He acknowledged Dr. Ruud's opinion but stated, "the diagnosis is of a type that would not be immediately disabling."

On October 14, 1971 Ms. Wagner wrote Mr. Carsten that she had still received no decision from C. P. Clare and that she could not process the medical claims until she knew whether extended benefits were available. On November 19, 1971 Mr. Carsten wrote to Smiley referring to the latter's letter to C. P. Clare. He enclosed a November 11 letter by Dr. Ruud which explained that Mrs. Carsten was totally disabled as of March 26. Smiley requested information on the first time Mrs. Carsten had seen a physician and the number of physicians she had seen from Dr. Ruud, who responded on December 16 that first contact was March 26 and that he was the only physician prior to that time.

On January 3, 1972 Smiley again wrote to C. P. Clare explaining why extended benefits were denied. He indicated a different result might follow if Mrs. Carsten had not worked a full day on her last day of work. On January 5, the company's termination report was sent to Smiley indicating that Mrs. Carsten had worked a full day on March 26 and a copy was sent to Mrs. Carsten. As a result of a telephone conversation with Mr. Carsten, it was determined that March 27 was the proper date of termination and that this had not been a full day of work. Consequently, Smiley notified Mrs. Carsten on January 17 that there would now be extended coverage available and asking whether she had purchased a group conversion policy.

Mr. Carsten provided Smiley with the policy number of the medical conversion policy as well as a list of premiums paid on January 25, 1972. He also included a list of premium payments on the converted life policy and requested a refund of all premi-

ums. On February 3, he received a letter from Mrs. Wagner stating that extended medical benefits were available, but that there could be no premium refunds. She advised him to write to the office that issued the policy about the premiums. On February 4 Smiley wrote a similar letter to Mrs. Carsten saying that the reimbursement question had been directed to Ms. Wagner. "It is quite possible that no reimbursement will be available." He said that it was for the home office to verify this position.

The next correspondence was not until May 20, 1972 when Mr. Carsten sent a letter to C. P. Clare & Co. stating that two conversion policies were in effect, asking if the group policy had been totally reinstated, and asking "Is your intent to pay on all policies, if not do you intend to refund premiums on conversion policies." The letter was forwarded to Smiley on May 26, 1972.

On June 6, Smiley wrote to Mr. Carsten explaining the group policy coverage and directing referral of any questions on conversion to Ms. Wagner. He instructed Carsten not to refer questions to C. P. Clare. On June 7, 1972 Mrs. Carsten died. On June 9, Carsten called Smiley about extension of group life and payment under the group conversion policies. Contrary to his earlier instructions, Smiley told him to write C. P. Clare on the life conversion policy and explained that there would be no premium refund on the medical conversion policy. Further refund questions were to be directed to Ms. Wagner.

Ms. Wagner wrote to B. Kratzer, a senior examiner in the home office claim department on June 15 and explained the medical conversion problems. She recounted telling Mr. Carsten that the health premium refund would probably not be available and instructing him to write Fall River about the problem. She requested that someone at the home office write to Carsten. A reply came from A. B. Anderson on July 11 stating that the medical conversion policy had been properly issued and that there would be no refund of premiums. There is no evidence that this was conveyed to Carsten. On July 31 Carsten sent a copy of the death certificate to Wagner and sought benefits under the converted life policy.

On August 25, 1972 E. Sitarz, Senior Analyst for the home office life claim department, was contacted by Emily Locker, Assistant Manager of the Regional Service Center at Chicago. She listed the premiums paid to date, the fact that there was payment of benefits under the group policy, and the fact that there was also a conversion life policy. "We assume refund of premiums for the above individual policy [N 2,762,690] is in order, however, please advise requirements to proceed accordingly." On August 31, 1972 Ms. Locker received a letter from Smiley which included a copy of the death certificate, a rundown of the case to date, an explanation of the denial of the extended benefits and the subsequent reversal, and the home office determination that no refund of health premiums was in order. "However, we did not know of the existence of the life conversion policy at this time." He also explained asking Carsten why the death certificate was sent after the group life benefits had been paid. Carsten had indicated he wanted benefits from the conversion policy. "At the time he told me this I did not explain it would not be possible to collect from both. I thought it best that the appropriate people do that."

On September 7, 1972 Ms. Locker wrote Carsten saying that the $4,000 received under the group life policy represented payment in full and that premiums on the conversion policy would be refunded, but not until the policy was sent to the Chicago office. On September 23 Carsten filed a complaint with the state insurance commission and after several letters between that office and Aetna officials, Barbara Fitz-Maurice wrote to Carsten on December 22, 1972 stating that nothing further had been heard from the insurance commission and therefore they were enclosing a premium refund check. She also requested the conversion policy be returned. Evidently the refund check was never cashed.

Carsten turned the matter over to an attorney and after several exchanges with Aetna, the last of which was June 26, 1973, Carsten commenced this action by summons and complaint on February 7, 1974. He alleged breach of contract and vexatious refusal to pay. An amended complaint was filed on May 28 alleging bad faith in refusing to pay. Both pleadings were answered and denied. Defendant then moved for summary judgment pursuant to SDCL 15–6–56, relying on the policy provisions.[1] Plaintiff resisted the motion by affidavit claiming the policy provisions had been waived. The trial judge granted the motion after briefs by both sides. In his view the undisputed provisions of the policy prevented recovery. Plaintiff appeals.

This court has set out several guidelines to aid trial courts in determining the propriety of granting a motion for summary judgment.[2] *Wilson v. Great Northern Railway Co.*, 1968, 83 S.D. 207, 157 N.W.2d 19. Examination of the record before the trial court in light of those guidelines compels us to disagree with the conclusion that the policy provisions dictate that defendant is entitled to judgment as a matter of law.

We have held on previous occasions that waiver and estoppel are available in a variety of circumstances to bring within the coverage of a policy risks that are specifically excluded therefrom. *State Automobile Casualty Underwriters v. Ruotsalainen*, 1965, 81 S.D. 472, 136 N.W.2d 884; *Farmers Mutual Automobile Insurance Co. v. Bechard*, 1963, 80 S.D. 237, 122 N.W.2d 86, 1 A.L.R.3d 1139. Plaintiff has alleged facts which, if proven, might well establish that defendant has waived the provisions found controlling by the trial court and is thereby barred from denying coverage under the conversion life policy.[3]

Defendant contends that it is not proper that this court consider the issue of waiver because it was not pled below. While it is true that the term "waiver" does not appear in either the complaint or the amended complaint, that issue is sufficiently raised if facts constituting a waiver are

---

1. The policy provision relied on provides:

   "When any insurance becomes effective under an individual policy issued under the conversion privilege, it shall be in exchange for all privileges and benefits under the group policy."

   Similarly the application for conversion provides:

   "I hereby apply to the AETNA LIFE INSURANCE COMPANY . . . for a policy of insurance upon my life in accordance with the provisions of Group Policy No. 58520, or Term . . . Policy . . ., insuring my life as an employee of C. P. Clare & Co." "I hereby agree that the issuance by the Company of the policy herein applied for shall be in exchange for all privileges and benefits with respect to the full amount of the term insurance on my life under said Group or said Term Policy."

2. The guidelines set out in *Wilson v. Great Northern Railway Co.*, 1968, 83 S.D. 207, 212, 157 N.W.2d 19, 21, are:

   "(1) The evidence must be viewed most favorable to the nonmoving party; (2) The burden of proof is upon the movant to show clearly that there is no genuine issue of material fact and that he is entitled to judgment as a matter of law; (3) Though the purpose of the rule is to secure a just, speedy and inexpensive determination of the action, it was never intended to be used as a substitute for a court trial or for a trial by jury where any genuine issue of material fact exists. (4) A surmise that a party will not prevail upon trial is not sufficient basis to grant the motion on issues which are not shown to be sham, frivolous or so unsubstantial that it is obvious it would be futile to try them. (5) Summary judgment is an extreme remedy and should be awarded only when the truth is clear and reasonable doubts touching the existence of a genuine issue as to material fact should be resolved against the movant. (6) Where, however, no genuine issue of fact exists it is looked upon with favor and is particularly adaptable to expose sham claims and defenses."

3. We do not intend to imply that these facts do constitute a waiver in this instance. Plaintiff has a heavy burden in that he must show clear and convincing evidence of waiver at trial. *Farmers Mutual Auto. Ins. Co. v. Bechard*, 1963, 80 S.D. 237, 122 N.W.2d 86. It is not the function of the court on a motion for summary judgment to predict who will prevail at trial, however; we need only determine that there is a genuine issue of material fact. *First Security Bank, Morristown v. Skjoldal*, 1976, S.D., 237 N.W.2d 675.

alleged. *State v. Aetna Insurance Co.*, 1931, 58 S.D. 548, 237 N.W. 771. This is not a case where waiver must be set out affirmatively. SDCL 15-6-8(c). Plaintiff was not required to file a reply to the answer and indeed would not be permitted to reply unless the court ordered a reply or unless defendant had counterclaimed. SDCL 15-6-7(a). Under SDCL 15-6-8(d) "[a]verments in a pleading to which no responsive pleading is required or permitted shall be taken as denied or avoided." Defendant's reliance on the policy provisions is therefore "taken as . . . avoided" by whatever defenses, including waiver, that plaintiff can prove. *State v. Aetna Insurance Co.*, supra.

Viewed in a light most favorable to the plaintiff, the evidence shows that defendant retained premiums on the converted life policy after they had knowledge that the conversion policy was not needed and tendered a refund only after a claim had been filed. Other courts have held that similar circumstances constitute a waiver of various policy exclusions. See e. g., *Bayer v. Lutheran Mutual Life Insurance Co.*, 1969, 184 Neb. 826, 172 N.W.2d 400; *Pomerenke v. National Life and Accident Insurance Co.*, 1968, 143 Ind.App. 472, 241 N.E.2d 390. We are unable to say that there is no genuine issue of material fact in this case. Accordingly, the judgment of the trial court is reversed and the cause remanded for trial.

DUNN, C. J., and COLER and ZASTROW, JJ., concur.

WOLLMAN, J., dissents.

WOLLMAN, Justice (dissenting).

As illustrated by the recitation of facts set forth in the majority opinion, a good deal of confusion existed on the part of defendant's employees in the several offices that handled the medical coverage policies and the life insurance coverage policies. Nowhere in the evidence, however, do I find anything that establishes a genuine issue of material fact with respect to plaintiff's claim that defendant had waived the policy

provisions that clearly limited coverage to one policy.

I would affirm the judgment.