Henry A. POPPEN, Charles Q. Mateer, and Della Wishard, Plaintiffs and Appellants,

v.

Susan WALKER, Director of South Dakota Lottery, and John Theeler, Charles Burke, H.I. King, III, Elaine Emery, Gary Richards, Beverly McCracken, and John Carmody, Members of South Dakota Lottery Commission, and Donald D. Archer, Defendants and Appellees.

No. 18374.

Supreme Court of South Dakota.

Argued Dec. 1, 1993.

Decided June 22, 1994.

Rehearing Denied Aug. 9, 1994.

Kent R. Cutler and Michael S. Simpkins, Cutler & Simpkins, Sioux Falls, for plaintiffs and appellants.

Mark W. Barnett, Atty. Gen., Larry Long, Charles D. McGuigan, Jeffrey P. Hallem, Asst. Attys. Gen., Pierre, for defendant and appellee State of S.D.

Thomas J. Welk, Michael S. McKnight of Boyce, Murphy, McDowell & Greenfield, Sioux Falls, for defendant and appellee Donald D. Archer.

STEELE, Circuit Judge.

Plaintiffs appeal from a grant of summary judgment for the defendants. We reverse and remand.

## PROCEDURAL HISTORY

On November 30, 1992, the Plaintiffs filed this action seeking an alternative writ of prohibition restraining the defendants (State) from operating video lottery and a writ of mandamus requiring the immediate revocation of video lottery licenses. Both parties filed cross motions for summary judgment. The trial court granted the State's motion, ruling that video lottery is a "lottery" within the meaning of Article III, § 25 of the South Dakota Constitution, that video lottery is owned and operated by the State, and that the State receives the entire net proceeds from video lottery operations. Plaintiffs appeal.

## DECISION

We hold that video lottery is not authorized under Article III, § 25 of the South Dakota Constitution.

## FACTS

The Constitution of the State of South Dakota was adopted in 1889. Article III, § 25 at that time provided:

The legislature shall not authorize any game of chance, lottery, or gift enterprise, under any pretense, or for any purpose whatever.

In 1970, this provision was amended to authorize the legislature to allow bona fide veterans, charitable, educational, religious, or fraternal organizations, civic and service clubs, volunteer fire departments, and other public spirited organizations to conduct games of chance when the entire net proceeds of such games of chance are devoted to educational, charitable, patriotic, religious, or other public spirited uses. 1970 S.D.Sess.L. ch. 1.

In 1982, the legislature offered another amendment to the vote of the people which would have rewritten Article III, § 25 as follows:

The legislature shall not authorize any game of chance, lottery, or gift enterprise, under any pretense, or for any purpose whatever provided, however, it shall be lawful for the legislature to authorize by law games of chance which are limited to wagering or coin operated gaming machines, bingo, lotteries, and card games.

This proposed amendment was rejected by the voters of this state in November of 1982.

In 1986, the legislature proposed the amendment with which we are concerned. The amendment added the following sentence to the original provision:

However, it shall be lawful for the legislature to authorize by law, a state lottery which is regulated, controlled, owned and operated by the State of South Dakota, either separately by this state or jointly in cooperation with one or more other states. The entire net proceeds of such lottery shall be devoted to the operation of state government or such other purpose as the legislature shall determine.

The people approved the amendment in November of 1986; it will be referred to as the "1986 amendment."

In 1987, following the adoption of the 1986 amendment, statutes were enacted creating a state lottery which at the time was limited to instant "scratch and match" games. In that same year, the Legislative Research Council was directed by the legislature to conduct a study regarding the implementation of video lottery games. One of the findings of the committee was that video lottery is a "lottery" under the South Dakota Constitution.

In 1989, a bill authorizing video lottery was passed and signed into law by Governor George S. Mickelson. The statutory scheme allowed private owners of the coin-operated gaming machines to retain the proceeds from machine operation after remission of twenty-five percent of the net machine income (money put into a machine less credits paid out) to the state. Subsequent amendments have increased the state's share of the proceeds to thirty-six percent.

The video machines are electronic devices which are available to play various games upon the insertion of cash. The games cur-

rently available are varieties of the games of poker, blackjack, bingo, and keno. A player may wager up to eight twenty-five cent credits. The number of credits available to win is determined by a combination of factors, including: (1) the game played, (2) the amount wagered, and (3) the difficulty of obtaining a particular winning hand or combination. Each machine is programmed to pay back eighty percent to ninety-six percent of the total amount of credits wagered based on a probabilities formula.

The machines are equipped with a "hold strategy" in the games of poker and blackjack. The strategy advises the player which cards to discard in poker and whether to draw another card in blackjack. Its purpose is to reduce or eliminate the element of skill so that the outcome is determined predominantly by chance. The hold strategy is designed to maximize the winnings of the player; if it is followed, an unskilled player would theoretically win as often and as much as a skilled player over the long run.

### STANDARD OF REVIEW

 Summary judgment is appropriate where the pleadings, depositions, admissions, exhibits and supporting affidavits show that there is no genuine issue of material fact and that the movant is entitled to judgment as a matter of law. *McKinney v. Pioneer Life Ins. Co.*, 465 N.W.2d 192 (S.D.1991). Summary judgment will be affirmed only when there are no genuine issues of material fact and the legal questions have been correctly decided. *Bego v. Gordon*, 407 N.W.2d 801, 804 (S.D.1987). The moving party has the burden to clearly show that there is no genuine issue of material fact and is entitled to a judgment as a matter of law. *Wilson v. Great Northern Railway Company*, 83 S.D. 207, 157 N.W.2d 19 (1968).

 This case presents no issue of material fact; rather, we are called upon to construe a constitutional provision. The proper construction to be given to such a provision is a question of law which is fully reviewable on appeal. *Dahl v. Sittner*, 474 N.W.2d 897, 899 (S.D.1991). Accordingly, the standard of review is de novo, and deference need not be given to conclusions of law by the trial court.

*Brown v. Egan Consol. School D. 50–2*, 449 N.W.2d 259, 260 (S.D.1989).

### ISSUES

#### I.

WHETHER VIDEO LOTTERY AS AUTHORIZED BY SDCL 42–7A IS A "LOTTERY" WITHIN THE MEANING OF ARTICLE III, § 25 OF THE SOUTH DAKOTA CONSTITUTION.

#### II.

WHETHER A LOTTERY AUTHORIZED BY SDCL 42–7A IS "REGULATED, CONTROLLED, OWNED AND OPERATED" BY THE STATE IN ACCORDANCE WITH ARTICLE III, § 25.

#### III.

WHETHER THE STATE RECEIVES THE "ENTIRE NET PROCEEDS" FROM VIDEO LOTTERY IN ACCORDANCE WITH ARTICLE III, § 25.

### ANALYSIS

#### ISSUE I

Plaintiffs assert that video lottery is not a "lottery" as that term is used in the 1986 amendment, and we are called upon to construe its meaning.

 The 1986 amendment is part of our constitution. Although constitutional provisions are not grants of power to the legislature, but are instead limitations on legislative authority, legislative acts are presumed to be constitutional. *Wyatt v. Kundert*, 375 N.W.2d 186, 191 (S.D.1985). That presumption is not overcome until the constitutionality of the act is clearly and unmistakenly shown and there is no reasonable doubt that it violates constitutional principles. *Independent Community Bankers Ass'n v. State*, 346 N.W.2d 737, 739 (S.D.1984); *Associated General Contr. v. Schreiner*, 492 N.W.2d 916, 919 (S.D.1992).

 It is the duty of the Supreme Court, not the legislature, to determine the

meaning of constitutional terms. *South Dakota Automobile Club v. Volk*, 305 N.W.2d 693, 700 (S.D.1981). The legislature cannot define the scope of a constitutional provision by subsequent legislation. *Edge v. Brice*, 113 N.W.2d 755 (Ia.1962). "The Constitution is the mother law. It is not the baby. Statutes must conform to the Constitution, not vice versa." *Cummings v. Mickelson*, 495 N.W.2d 493, 507 (S.D.1993), (Henderson, J., concurring in part; dissenting in part).

■■■ In determining the meaning of a constitutional provision, courts are guided by applicable rules of construction. First and foremost, the object of construing a constitution is to give effect to the intent of the framers of the organic law and of the people adopting it. *Schomer v. Scott*, 65 S.D. 353, 274 N.W. 556, 559 (1937); *State v. Jorgenson*, 81 S.D. 447, 136 N.W.2d 870, 875 (1965). The Supreme Court has the right to construe a constitutional provision in accordance with what it perceives to be its plain meaning. *State v. Neville*, 346 N.W.2d 425, 428 (S.D. 1984). When words in a constitutional provision are clear and unambiguous, they are to be given their natural, usual meaning and are to be understood in the sense in which they are popularly employed. *Kneip v. Herseth*, 87 S.D. 642, 214 N.W.2d 93, 102 (1974). If the meaning of a term is unclear, the Court may look to the intent of the drafting body. *Cummings*, 495 N.W.2d at 499.

■■■ The 1986 amendment is an exception to the general prohibition against gambling in the South Dakota Constitution. An exception to a constitutional provision must be strictly construed and limited to objects fairly within its terms. *Commonwealth v. Yee*, 361 Mass. 533, 281 N.E.2d 248, 251 (1972). Further, the Court is not concerned with the wisdom or expediency or the need of a constitutional provision, but only whether it limits the power of the legislature. *Queenside Hills Realty Co., Inc. v. Saxl*, 328 U.S. 80, 66 S.Ct. 850, 90 L.Ed. 1096 (1945).

With the rules of construction in mind, we first determine whether the phrase "a state lottery" in the 1986 amendment is ambiguous

in the sense it is used. If it is not, we must attribute to it the plain meaning, and there is no need for construction. *American Rim and Brake, Inc. v. Zoellner*, 382 N.W.2d 421, 424 (S.D.1986); *Simpson v. Tobin*, 367 N.W.2d 757, 763 (S.D.1985).

The term "lottery" is not defined in our constitution. To determine whether the term is susceptible to more than one meaning, we turn first to the dictionary definitions. Webster's New Collegiate Dictionary (1981) defines lottery as:

> an event or affair whose outcome is or seems to be determined by chance.

Webster's New American College Dictionary (1981) defines it more narrowly as:

> a method of selling numbered tickets and awarding prizes to the holders of certain numbers drawn by lot.

The American Heritage College Dictionary (3d. ed. 1993) defines lottery in three senses:

> 1) a contest in which tokens are distributed or sold, the winning token or tokens being secretly predetermined or ultimately, selected in a random drawing; 2) a selection made by lot from a number of applicants or competitors; 3) an activity or event regarded as having an outcome depending on fate.

Random House Webster's Dictionary (1993) defines lottery as:

> 1) a gambling game in which a large number of tickets are sold and a drawing is held for prizes; 2) a drawing of lots.

The definition in Funk and Wagnalls Standard Dictionary (1991) is

> a drawing for prizes for which numbered tickets are sold, the winning tickets being selected by lot.

Although in its usual sense the dictionary definition of the term "lottery" appears to contemplate the sale of tokens or tickets and a drawing for prizes, some subsensel [1] definitions appear to be broader in scope to include any event whose outcome is dependent on chance.

1. When a word has more than one sense, the senses are arranged analytically according to central meaning clusters. Thus, the definition with the central meaning is given first, then the subsenses. *See* American Heritage Dictionary, 2nd College Ed. 49 (1985).

We next turn to definitions of lottery which have evolved in the organic law. The term "lottery" has no technical meaning; rather, courts adopt the generally accepted definition in popular use. *Quatsoe v. Eggleston,* 42 Or. 315, 71 P. 66 (1903); *State v. Coats,* 158 Or. 122, 74 P.2d 1102 (1938). The usual generic definition of the term in the organic law is any plan or scheme which has three essential elements: 1) a prize, 2) the element of chance, and 3) consideration paid for the opportunity of winning the prize. *Coats,* 74 P.2d at 1106; *State v. Nelson,* 210 Kan. 439, 502 P.2d 841, 846 (1972); *State v. Brotherhood of Friends,* 41 Wash.2d 133, 247 P.2d 787, 797 (1952). It is this broad definition which the State urges us to adopt. Because the term "lottery" has more than one meaning, we find that it is ambiguous in the context of the 1986 amendment, and therefore subject to construction by this Court.

## THE ORIGINAL PROVISION

In order to properly construe the phrase "a state lottery" in the 1986 amendment, we must first determine the nature of what was prohibited in the original provision.

For most of this century, lotteries were suppressed, either outright or in most forms, in almost every state of the union and in Great Britain.[2] Lotteries were not always prohibited. In fact, governmentally sanctioned lotteries flourished in the colonial era as a means of raising revenue for public improvements, and were in widespread use for such purposes throughout most of the Nineteenth Century.[3] The usual form of lottery was one in which the legislature would grant a charter to a lottery company for a period of years in exchange for a cash sum plus a percentage of receipts from the sale of tickets.[4] The charter company would then sell the tickets to the public, which tickets were transferable; a ticket would entitle a buyer to share in the distribution of prizes. Under these charters, lottery companies sold tickets aggressively, ensnaring the public, regardless of age, class, or station.[5] This type of lottery spread throughout the country, and resulted in graft, corruption, and crime.[6] By the middle 1800s, millions of dollars were involved in as many as 420 chartered lotteries across the country. It was the chartered lottery that the United States Supreme Court was concerned with in the case of *Phalen v. Commonwealth of Virginia,* 8 How. 163, 49 U.S. 163, 12 L.Ed. 1030 (1850). In that case, Justice Grier wrote:

> Experience has shown that the common forms of gambling are comparatively innocuous when placed in contrast with the widespread pestilence of lotteries. The former are confined to a few persons or places, but the latter infests the whole community; it enters every dwelling; it reaches every class; it preys upon the hard earnings of the poor; it plunders the ignorant and simple.

8 How. at 168, 49 U.S. at 541, 12 L.Ed. at 1033. These lotteries were the principal evil which led to their prohibition in state constitutions. *Stone v. State of Mississippi,* 101 U.S. 814, 25 L.Ed. 1079 (1879).

Original state constitutional provisions prohibiting lotteries varied in language. Most either prohibited lotteries outright or prohibited the legislature from authorizing them.[7] Others prohibited "gift enterprises" as well as lotteries.[8] A few, including South Dakota, prohibited any "game of chance, lottery, or gift enterprise." [9] None of the constitutional provisions cited define the term "lottery."

---

**2.** *Lee v. City of Miami,* 121 Fla. 93, 163 So. 486 (1935).

**3.** *Brotherhood of Friends,* 247 P.2d at 794 (citing A.R. Spofford, *Lotteries in American History,* 4 Senate Misc. Documents, 173 (1892)).

**4.** *City of Miami,* 163 So. at 489.

**5.** *City of Miami,* 163 So. at 489.

**6.** *Brotherhood of Friends,* 247 P.2d at 794.

**7.** Washington—art. II, § 24; Oregon, art. 15, § 4; Kansas, art. 15, § 3; Iowa, art. III, § 28; Mississippi, art. XII, § 15; West Virginia, art. VI, § 36 (amended 1984); South Carolina, art. XVII, § 7; Rhode Island, art. 6, § 15.

**8.** Texas, art. III, § 27; West Virginia, art. VI, § 36 (as amended 1984).

**9.** S.D. Const. art. III, § 25; Nebraska, art. III, § 24.

Most states have enacted statutes prohibiting lotteries and other forms of gambling, either pursuant to self-executing constitutional mandates or under the general police power, or both. 38 Am.Jur.2d, *Gambling*, § 57 (1968). Under the constitutional mandates and statutes prohibiting lotteries as a matter of public policy, the courts developed a broad definition of the term "lottery" in order to dissuade all sorts of ingenious attempts to circumvent the prohibition. Absent any statutory definition, courts generally hold that any enterprise, whether it be a plan, scheme, game or other artifice, is a "lottery" if the three elements of chance, prize and consideration are present. This broad definition is used especially when the issue is whether a scheme, plan or device falls under a constitutional provision in which the only prohibition is against a lottery.[10] For example, in Idaho the proposed original constitutional provision contained the exact language as that of South Dakota; however, the term "game of chance" was deleted and the result was a prohibition against "any lottery." The court in *State v. Village of Garden City*, 74 Idaho 513, 265 P.2d 328, 334 (1953), held that the meaning of the term "lottery" as finally adopted was plain and unambiguous, and included any scheme which included the elements of prize, chance, and consideration. *See also, Brotherhood of Friends*, 247 P.2d 787; *Sherwood & Roberts—Yakima, Inc. v. Leach*, 67 Wash.2d 630, 409 P.2d 160 (1965).

Diverse plans, schemes, and games of all sorts have been found to be lotteries under the broad organic law definition, including: slot machines;[11] pyramid schemes;[12] wheels of fortune;[13] sales promotion schemes;[14] "tailor clubs;[15]" bingo;[16] punch boards;[17] pinball machines;[18] and theatre bank nights.[19] 38 Am.Jur.2d, *Gambling*, at § 62, et seq.

As opposed to those constitutional provisions which prohibit only lotteries, our constitution prohibits the legislature from authorizing three items: games of chance, lotteries, and gift enterprises. S.D. Const., art. III, § 25. The definition of "gift enterprise" is not germane to this case; however, the distinction between a "game of chance" and a "lottery" as contemplated by our forefathers is important.

When a constitution prohibits both games of chance and lotteries, the question arises as to the distinction between the two terms. When both terms are used, the term "lottery" has a narrower meaning in that it is a special form of game of chance. *Contact, Inc. v. State*, 212 Neb. 584, 324 N.W.2d 804 (1982). It is the term "game of chance" which has a broad generic meaning.[20]

To define "game of chance," we turn to the organic law. A game of chance is one in which the result as to success or failure depends less on the skill and experience of the player than on a purely fortuitous circumstance incidental to the game, or the manner of playing it, or the device or apparatus with which it is played. *Baedaro v.*

---

10. *State v. Mabrey*, 245 Iowa 428, 60 N.W.2d 889 (1953); *Coats*, 74 P.2d 1102.

11. *State v. Marck*, 124 Mont. 178, 220 P.2d 1017 (1950).

12. *State v. Dahlk*, 111 Wis.2d 287, 330 N.W.2d 611 (Ct.App.1983).

13. *State v. Schubert Theatre Players Co.*, 203 Minn. 366, 281 N.W. 369 (Minn.1938).

14. *Sherwood & Roberts—Yakima, Inc. v. Leach*, 409 P.2d 160.

15. *State v. Moren*, 48 Minn. 555, 51 N.W. 618 (1892).

16. *State v. Nelson*, 210 Kan. 439, 502 P.2d 841 (1972).

17. *State v. Hudson*, 128 W.Va. 655, 37 S.E.2d 553 (1946).

18. *Coats*, 74 P.2d 1102.

19. *State v. Schubert Theatre Players Co.*, 281 N.W. 369.

20. It is interesting to note that in Nebraska, where the constitutional provision contains both terms, a pinball machine was found to be a game of chance (*Baedaro v. Caldwell*, 56 N.W.2d at 709) whereas in Oregon, where the constitution prohibits only "lottery," pinball machines were found to be lotteries. *State v. Coats*, 74 P.2d 1102.

*Caldwell,* 156 Neb. 489, 56 N.W.2d 706, 709 (1953). It is a contest wherein chance predominates over skill. *Bayer v. Johnson,* 349 N.W.2d 447, 449 (S.D.1984). The test is whether chance is the determining element in the outcome of the game. *Stubbs v. Dick,* 89 N.E.2d 480, 482 (Ohio, 1949). The three elements of prize, chance, and consideration are present in a game of chance. *Automatic Music and Vending v. Liquor,* 426 Mich. 452, 396 N.W.2d 204 (1986). It is an encompassing definition which includes most forms of gaming; cards, dice, and craps,[21] pinball machines,[22] blackjack and roulette,[23] and video poker machines[24] have been found to be games of chance.

We conclude that by separately stating the terms "game of chance" and "lottery," the framers of the original provision intended the term "game of chance" to be broad in scope, including most forms of gaming, and the term "lottery" in the narrower sense contemplating the sale of tokens or tickets to large numbers of people for the chance to share in the distribution of prizes for the purpose of raising public revenue.

## THE 1986 AMENDMENT

 In determining what the framers of the 1986 amendment and the people adopting it intended by the term "lottery," we first look to any statutes defining it. Although we are not bound by statutory definitions, they do supply guidance. *Marston v. Kline,* 8 Pa.Cmwlth. 143, 301 A.2d 393 (Pa.1973).

In 1970, Article III, § 25 of our constitution was amended to allow the legislature to authorize "games of chance" conducted by veterans, charitable, and other organizations. 1970 S.D.Sess.L. ch. 1. Although empowered to authorize any form of games of chance, the legislature chose to limit authorized gambling to bingo and lotteries by enacting SDCL 22–25–23 through SDCL 22–25–25. SDCL 22–25–24 defines the term "lottery":

As used in this chapter, "lottery" or "lotteries" means a plan whereby for a valuable consideration money is raised by selling chances to share in the distribution of prizes.[25]

This definition, the State concedes, contemplates the selling of chances (tickets) and a drawing for prizes—the layman's definition of a "raffle" where tickets are sold. That the definition envisions a "raffle" is reinforced by SDCL 22–25–25(5): "[h]owever, a lottery prize of eighteen thousand dollars or less in value may be given to a person who sells a winning lottery *ticket* ..." (emphasis added), and SDCL 22–25–25(6) which states: "[a] municipality may ... prohibit within the municipality the sale of lottery *tickets....*" (emphasis added).

The statutes were part of the 1970 Session Laws, Chapter 247. The preamble to the enactment (Section 1) stated:

The increasing occurrence in the operation of the game of "bingo" and "lotteries" for commercial gain is declared to be harmful to the morals of the citizens of this state and against public policy. It is the intent and purpose of this Act to restrict the lawful operation of and participation in the game of "bingo" and "lotteries" to a mild form of social recreation and amusement devoted to the raising funds for the benefit of religious, charitable, fraternal, or other associations, not organized for pecuniary profit, and duly existing under the laws of this state.

By restricting the forms of "games of chance" authorized, and by the public policy statement in Section 1 of Chapter 247, it is clear that the legislature did not intend to authorize "games of chance" which might take the form of slot machines, card games, roulette, craps, and other games which would fall within the broad definition of "games of

---

21. *State v. LeNoir,* 60 Ariz. 57, 130 P.2d 1037 (1942).

22. *Hunter v. Mayor and Council of Teaneck Tp.,* 128 N.J.L. 164, 24 A.2d 553 (1942).

23. *State ex rel Chwirka v. Audino,* 260 N.W.2d 279 (Iowa 1979).

24. *Garono v. State,* 37 Ohio St.3d 171, 174–176, 524 N.E.2d 496, 500 (1988).

25. This statute redefined "lottery." *See* S.D.C. 24.0201 for the earlier definition.

chance" or "lottery." The statutory definition of "lottery" had been in place for sixteen years prior to the adoption of the 1986 amendment, and the framers, like everyone else, must be presumed to have known the law at the time. *Kneip v. Herseth*, 214 N.W.2d at 102.

In 1982, the legislature proposed an amendment to Article III, § 25 which would have allowed the legislature to authorize games of chance "[w]hich are limited to wagering on *coin-operated gaming machines,* bingo, *lotteries,* and card games" (emphasis added). The amendment was defeated by the people. It is important to note that the framers of the amendment distinguished between the terms "coin-operated gaming machines" and "lotteries," and that the distinction was apparent to the voters from the wording itself.

■ Next, amendments to a constitutional provision proposed but rejected may be considered in determining the intent of the framers. *Fairbank v. U.S.*, 181 U.S. 283, 21 S.Ct. 648, 45 L.Ed. 862 (1901). The 1986 amendment was first introduced as House Joint Resolution 1001. On February 10, 1986, Representative Lars Herseth proposed to amend the bill by inserting "or video poker" after the word "lottery" wherever it appeared. The motion was defeated. House Journal, February 10, 1986, at 567. We believe that there is no difference between "video poker" and "video lottery." Both envision a game played on a video machine. In fact, video poker is one game available on current video lottery machines. Representative Herseth apparently saw a distinction between the term "lottery" and "video poker." We infer that the House of Representatives specifically considered inclusion of video gaming into the 1986 amendment and rejected it. This is not a case wherein a precedent constitutional provision must be construed to determine whether a subsequent technological advance falls within its parameters. The video gaming concept was in existence in 1986, considered, and voted down.

Following the adoption of the 1986 amendment, the legislature in 1987 authorized only

a "scratch and match" lottery. The question of whether to authorize video lottery was referred to the Interim Lottery Study Committee. The committee itself became concerned about whether video lottery was constitutional but concluded that it was, relying in part on the case of *Video Consultants of Nebraska v. Douglas,* 219 Neb. 868, 367 N.W.2d 697 (Neb.1985). *Video Consultants* held that a video device similar to the type currently in use in South Dakota did not constitute a "gaming device" under a 1983 statute. Such reliance was misplaced. The court in *Video Consultants* was not construing the Nebraska constitutional provision, but was determining the applicability of a series of statutes enacted under the general police power, one of which broadly defined the term lottery. The state on appeal conceded that the video device was a lottery as defined by the statute. The issues were whether video machines fell within an exception to the general prohibition and whether a ticket was required as part of the "playing phase" of the device. In regard to the latter issue, the court merely held: "[T]he legislature employed unrestrictive, generic terms in describing the means to conduct a permissible lottery so that any article or any method was available in the 'playing phase' of a legal lottery." [26] *Video Consultants,* 367 N.W.2d at 701. The case does not in any way stand for the proposition that video lottery is permissible under the Nebraska Constitution.

■ We must construe the 1986 amendment so as to give effect to every part and clause. *Anderson v. Teimann,* 182 Neb. 393, 155 N.W.2d 322, 326 (1967). The 1986 amendment provides that the state lottery may be regulated, controlled, owned, and operated by South Dakota, either separately or jointly or in cooperation with one or other states. We may take judicial notice of historical facts which are matters of general knowledge and specially those peculiarly connected with or affecting the state. SDCL 19–10–2(1); 1 Spencer A. Gard, *Jones on Evidence,* § 2:35 (1972); *Cummings,* 495 N.W.2d at 496. We may also consider the circumstances under which a constitutional provision was formed, the general spirit of

26. Neb.Rev.Stat. § 28–1101(6).

the times, and the prevailing sentiment of the people. *Maynard v. Board of District Canvassers,* 84 Mich. 228, 47 N.W. 756 (Mich. 1890).

We take judicial notice that at the time the 1986 amendment was proposed, the predominant forms of state-sanctioned lotteries in the Midwest region were the "scratch and match" and "on-line" lotteries operated either by individual states or by several states cooperatively. That fact in conjunction with the manner in which the 1986 amendment is phrased ("[e]ither separately or jointly or in cooperation with one or other states") leads to the conclusion that instant lottery and on-line lottery were the forms of lottery contemplated. There is no evidence from any source in the record that any form of video gaming was envisioned when the 1986 amendment was proposed to the people.

■■■ We should construe terms in a constitutional provision in pari materia. That rule of construction supposes that all enactments are intended to be harmonious in their several provisions. *Sales Tax Liability of Valley Queen Cheese,* 387 N.W.2d 39, 41 (S.D.1986). Therefore, if possible, we must endeavor to construe the term "lottery" in the amendment in the same sense as in the original provision. We conclude from the applicable rules of construction, the modern dictionary definitions of the term "lottery," and the history of and circumstances surrounding the 1986 amendment, that the framers of the amendment and the people adopting it had in mind the same concept of lottery as did our forefathers: a plan or scheme involving the sale of tokens or tickets to a large number of participants for the chance to share in the distribution of prizes by drawing or lot for the purpose of raising public revenue.

## VIDEO LOTTERY IS A GAME OF CHANCE

■■■ One element which distinguishes a game of chance from a lottery as we have defined it, is that a "game of chance" encompasses less pervasive games which involve one or several players as opposed to a large number. Another distinction is that in a lottery, skill, choice or control of the player

has no place. A token or ticket is purchased by the participant with no idea of the potential result. The participant buys a ticket and takes a chance; whether the participant is a winner or a loser is completely a matter of fate. In games of chance other than lotteries, the player has some conscious control over his input. For instance:

> [I]n a "game" such as craps for money, or roulette, the participant can make his bet selectively and base that selection upon a calculation of ascertainable odds. Even on a punch board operation, the player may choose the area on the board where his choice may be dictated by a hunch or guess.

*State v. Beane,* 52 Ohio Misc. 115, 118, 370 N.E.2d 793, 795 (1977).

These distinctions place video lottery in the category of a "game of chance" as contemplated in our constitution. In video lottery, there is only one participant playing the machine; there is no ticket or token sold or drawing held in its usual sense, and there are choices available to the participant in playing the game, which choices affect the outcome.

The State vigorously argues that the "hold strategy" built into the machine program for video poker and blackjack removes all elements of skill and relegates the outcome to pure chance.

In the first place, the regulations of the Lottery Commission seem to impeach that position. A.R.S.D. 48:02:08:03(1) states that:

> Video games that are not affected by player skill shall pay out a minimum of 80 percent and not more than 95 percent of the amount wagered.

A.R.S.D. 48:02:08:03(2) also implies that skill is involved:

> Video games that are affected by player skill, such as video draw poker and blackjack, shall pay out a minimum of 83 percent and no more than 96 percent of the amount wagered.

Secondly, the hold strategy may substantially eliminate the element of skill as a factor, but does not remove all elements of choice; its object is to maximize winnings for the player, not to eliminate all choices save

one. A player does not have to follow the hold strategy; he can make another choice and still win something. For example, in the game of video poker, if a player is dealt a two, three and ten of hearts and a five and six of another suit, the hold strategy will advise to discard the five and six to try for a flush. The odds of success are one in sixteen. The player would have the choice, however, to discard the ten and try for a "straight" (one chance in thirteen). The flush would result in greater winnings but the odds of hitting the flush would be higher. Although over an enormous period of time a player following the hold strategy would maximize his wins and winnings, a player with limited funds and limited playing time may decide to follow the more conservative choice.

Even in the games of keno and bingo, which do not involve the hold strategy, the player by conscious input selects numbers or cards which he may base on guess or hunch as the game progresses. All of the video games currently offered feature this element of choice. It is this element which allows the player to interact with the machine and makes the game a contest between person and machine, however illusory and one-sided the contest may be. It is this element which introduces concepts of variable odds and wagering which are not present in a lottery.

In the recent case of *U.S. v. Dobkin*, 188 W.Va. 209, 423 S.E.2d 612 (1992), the court addressed the question of whether video poker machines violated a statutory provision prohibiting lotteries.[27] The court flatly stated: "However, W.Va.Code 61–10–11 [1939] is not violated ... because such machines have no relation whatsoever to a lottery or a raffle." *Dobkin*, 423 S.E.2d at 615.

We are firmly convinced beyond any reasonable doubt that video lottery is not a "lottery" as contemplated under our constitution but is a "game of chance" which is prohibited by Article III, § 25. Were we to adopt the State's definition of lottery (any plan, scheme, game, or enterprise which contains the elements of prize, chance, and consideration), the legislature would be empowered to sanction just about any form of gambling heretofore so vigorously suppressed by constitutional provisions, statutes, and the courts. The State's argument turns the public policy against gambling inside out by contending that the people have empowered the legislature to sanction any form of gaming which contains the "three elements." Theoretically, slot machines would be constitutionally authorized,[28] as would all other forms of gaming heretofore prohibited as lotteries by the organic law.

The 1986 amendment was an exception to the general prohibition against gambling. The intent of the people in adopting that amendment was not to give the legislature carte blanche power to authorize any form of gaming which contains the elements of prize, chance, and consideration. The sole power granted was to authorize "a state lottery," not state "games of chance."

## ISSUES II and III

■ Our decision on Issue I disposes of this case. Principles of judicial restraint dictate that when an issue effectively disposes of the case, other issues that are presented should not be reached. *See Manning v. Upjohn Co.*, 862 F.2d 545 (5th Cir.1989). This principle is especially applicable when constitutional issues are involved. *State v. Devericks*, 77 S.D. 509, 94 N.W.2d 348 (1959) (citing *Friese v. Gulbrandson*, 69 S.D. 179, 8 N.W.2d 438 (1943)). Therefore, we decline to reach the constitutional questions by issues II and III.

The summary judgment in favor of the state is reversed. We remand to the trial court with instructions to enter summary judgment in favor of the plaintiffs.

SABERS, J., concurs.

MILLER, C.J., and HENDERSON, J., concur specially.

---

27. W.Va.Code 61–10–11.

28. The state conceded at oral argument that a slot machine would be a lottery under its definition. Slot machines are prohibited by SDCL 22–25–13, except in Deadwood, South Dakota.

AMUNDSON, J., dissents.

STEELE, Circuit Judge for WUEST, J., disqualified.

MILLER, Chief Justice (concurring specially).

In one of the most agonizing decisions I have made in my nearly twenty-four years on the bench, I reluctantly join the majority opinion.*

Let there be no doubt—each member of this Court fully appreciates the devastating negative impact this decision will have upon many citizens of this state. New businesses were created and a number of existing businesses expanded in reliance on video lottery. Our hearts are heavy for the families who rely on those businesses for their livelihood. Further, we are acutely aware of the significant impact on the state budget; approximately $60 million dollars in video lottery revenue used to fund worthwhile state programs will be lost.

To those adversely affected, I say, "Don't blame this Court!" Too often courts, and particularly appellate courts, are blamed for decisions that have a negative effect on the lives of both individuals and society. Even if courts periodically deserve that criticism, it is not justified in this case.

As the majority so aptly notes, at the time video lottery was created, the South Dakota Constitution clearly prohibited "any game of chance" or "lottery" other than "a state lottery." I ask rhetorically: "Why did governmental entities unthinkingly *assume* that games such as video poker, blackjack, or keno were included in the definition of 'a state lottery' rather than 'any game of chance'? Did they ever stop to think what the voters *assumed* when they approved 'a state lottery'?" Obviously someone was concerned about the distinction, for, as the majority notes, an earlier unsuccessful attempt was made in the 1986 Legislature to expressly include "video poker" in the proposed constitutional amendment.

Further, the Legislature's Interim Lottery Study Committee, concerned about the constitutionality of video lottery, apparently sought legal advice from its staff, and based thereon, determined that video lottery was constitutional.

Additionally, Governor Mickelson posed the following question to the Attorney General:

Does the legislative and regulatory scheme authorized in implementing video lottery in the state of South Dakota satisfy the requirement of Article III, § 25 of the South Dakota Constitution that a state lottery be regulated, controlled, owned and operated by the state of South Dakota?

Via an official opinion, the Attorney General advised the Governor that the video lottery legislation "passes constitutional muster." S.D. Att'y Gen. Op. 91–04 (1991). Further, relying exclusively on a dictionary definition, the opinion stated that "the video lottery scheme does constitute a lottery." *Id.* at 7.

Although it is always easy to second guess those in authority, one wonders why this Court, whose constitutional role is the interpretation of the law, was never consulted. There is extensive precedent for such an inquiry.

Under our state constitution, the Governor of South Dakota has the power to request advisory opinions from this Court:

The Governor has authority to require opinions of the Supreme Court upon important questions of law involved in the exercise of his executive power and upon solemn occasions.

S.D. Const. art. V, § 5.

Historically, we have given advisory opinions on significant state issues. In 1990, we advised Governor Mickelson on the extent of his authority to make financial commitments concerning the state's involvement in a corn

---

* Although the majority does not reach issues II & III, I sound a note of caution. Should a new constitutional amendment to allow video gambling be proposed, I advise its drafters to explicitly address both the extent to which gaming devices must be regulated, owned and operated by the state and the extent to which gaming proceeds must go to the state. Failure to do so may once again result in a ruling of unconstitutionality, producing further uncertainty and economic havoc.

wet-milling plant. *In re Request for an Advisory Opinion,* 456 N.W.2d 546 (S.D.1990). We advised Governor Janklow concerning his authority to appoint members of a public authority to issue revenue bonds to finance agricultural loans and business enterprises. *In re Request for an Advisory Opinion,* 387 N.W.2d 239 (S.D.1986). We also rendered an opinion to Governor Janklow concerning the interpretation of statutes following cancellation of the state's liability insurance policy. *In re Request for Opinion of the Supreme Court,* 379 N.W.2d 822 (S.D.1985). Governor Kneip obtained an opinion regarding the constitutionality of an act authorizing a bridge authority to issue revenue bonds. *In re Opinion of the Supreme Court,* 257 N.W.2d 442 (S.D.1977). We gave an opinion to Governor Boe pertaining to the constitutionality of legislation for tax relief. *In re Opinion of the Judges,* 81 S.D. 629, 140 N.W.2d 34 (1966).

Although the above are but a few of the more important advisory opinions rendered to governors, not one of them approaches the enormous statewide impact involved here. When considering the devastating economic consequences to this state and its citizens, it is indeed unfortunate that our advice was not sought earlier. As this Court stated in 1933, this situation was truly

> a time when the separate and co-ordinate branches of the government of this state, executive, legislative, and judicial, should co-operate to the fullest extent possible for the public welfare.

*Opinion of the Judges,* 61 S.D. 107, 109–10, 246 N.W. 295, 296 (1933) (answering gubernatorial request for opinion relating to authority to pass reapportionment act).

Let my message be clear: I am pointing the finger at no individual. I am simply saying that in the weeks to come, we in the judicial branch should not be the "whipping boy" for those who are disappointed, hurt or angered by the opinion we hand down today. I only suggest that the problems that will follow this decision might have been avoided had our advice been requested at the beginning.

I am sure that for each member of this Court it would have been far easier to find that video poker was included within the definition of a lottery. However, the easy road is not always the right road. As judges we take our oath to uphold the constitution seriously; we wear our black robes with pride; we make the difficult decisions and take the consequences that flow from them, praying that the people will understand. We should not be condemned for performing our sworn duty to uphold the very constitution under which the people created the State of South Dakota.

HENDERSON, Justice (concurring specially).

If our State Constitution admits of two constructions, one of which is safe by conservative deduction and the other precarious; and if one construction is precise and the other is obscure or vague, I would travel the road of the safe and the precise. If there is to be an enlargement of a constitutional provision, this should spring from the power and the vote of the people, who by amended document may enlarge it if they so find it necessary. There is nothing to support the premise that video gaming was envisioned within the 1986 constitutional amendment. Despite the purposeful omission of the term "video poker" from Art. III, § 25, video lottery was born. Had the will of the Legislature and the people been to permit video-style gambling, such could have been drafted into the proposed amendment; but it was not. *Kneip v. Herseth,* 87 S.D. 642, 214 N.W.2d 93, 102 (1974). To assume, by construction, that which the State Constitution does not provide, would create boundless power in the Supreme Court of this state.

If our State Constitution has bounds—and it does—then the interpretive decisions thereunder by this Court must be within the powers and authority which that instrument bestows. If the power bestows, then the enactment of a law must be within that power. A law can be promulgated by the State Legislature only under an enumerated objective of the State Constitution. A law cannot be enacted to defeat the purposes for which the State Constitution is drawn. *South Dakota Auto. Club, Inc. v. Volk,* 305 N.W.2d 693 (S.D.1981). "In other words ... what cannot

be done directly because of constitutional restriction cannot be accomplished indirectly by legislation which accomplishes the same result." *Fairbank v. United States,* 181 U.S. 283, 294, 21 S.Ct. 648, 653, 45 L.Ed. 862 (1901); *Associated General Contr. v. Schreiner,* 492 N.W.2d 916, 923 (S.D.1992).

All presumptions are in favor of the construction of a statute, and this continues until the contrary is shown beyond a reasonable doubt. The contrary has been so established here. *Crowley v. State,* 268 N.W.2d 616 (S.D.1978). Therefore, I join the majority opinion in its holding that video lottery is violative of Art. III, § 25 of the South Dakota Constitution.

AMUNDSON, Justice (dissenting).

As is evident, this appeal springs from the trial court's grant of summary judgment. The seminal case on appellate review of summary judgment decisions is *Wilson v. Great Northern Ry. Co.,* 83 S.D. 207, 211, 157 N.W.2d 19, 21 (1968), wherein this court stated:

> Summary judgment is a comparatively new procedure in this state and became a part of our practice when we adopted the federal rules of civil procedure with a few minor variations. Consequently we turn to the federal court decisions for guidance in their application and interpretation. In an opinion rendered shortly after the adoption of the federal rules, the late Judge Gardner wrote: 'The question presented by such a motion is whether or not there is a genuine issue of fact. It does not contemplate that the court shall decide such issue of fact, *but shall determine only whether one exists.*' (Emphasis added.)

There is a legion of cases in which this court followed the *Wilson* precedent by reversing summary judgment when a genuine issue of fact was found to exist. *See Davis v. Frizzell,* 504 N.W.2d 330 (S.D.1993); *Easson v. Wagner,* 501 N.W.2d 348 (S.D.1993); *Lamp v. First Nat. Bank of Garretson,* 496 N.W.2d 581 (S.D.1993); *Du–Al Mfg., a Div. of SOS Consol. Inc. v. Sioux Falls Const.,* 487 N.W.2d 29 (S.D.1992); *Peterson v. Sioux Valley Hosp. Ass'n,* 486 N.W.2d 516 (S.D. 1992); *Weiszhaar Farms, Inc. v. Live Stock State Bank,* 467 N.W.2d 752 (S.D.1991); *First Western Bank v. Livestock Yards Co.,* 444 N.W.2d 387 (S.D.1989); *Drier v. Great Am. Ins. Co.,* 409 N.W.2d 357 (S.D.1987); *Zens v. Chicago, Milwaukee, St. Paul & Pac. RR,* 386 N.W.2d 475 (S.D.1986); *Salem Sch. Dist. 43–3 v. Puetz Constr.,* 353 N.W.2d 51 (S.D.1984); *Bourk v. Iseman Mobile Homes,* 316 N.W.2d 343 (S.D.1982); *Carsten v. Aetna Life Ins. Co.,* 247 N.W.2d 679 (S.D.1976); *Brasel v. Myers,* 89 S.D. 114, 229 N.W.2d 569 (1975).

As House Joint Resolution No. 1001 made its journey through the legislative process, an amendment was proposed to change the resolution as follows:

> However, it shall be lawful for the legislature to authorize by law a state lottery *or video poker* which is regulated, controlled, owned and operated by the State of South Dakota, either separately by this state or jointly or in cooperation with one or more other states. The entire net proceeds of such lottery *or video poker* shall be devoted to the operation of state government or such other purpose as the legislature shall determine. (Emphasis added.)

This proposed amendment was an attempt to incorporate video poker into the constitutional amendment. This proposal was defeated, so video poker was not part of the amendment voted upon by the electorate. If, as the majority states, there is no difference between "video poker" and "video lottery," the balance of the majority opinion's discussion is not required. Why? Because the legislature said no to video poker in 1986 and, if in fact the two are the same as believed by the majority, the constitutional amendment did not authorize video lottery.

The point here is that there is an obvious question of fact; namely, whether video poker, which was to be owned, controlled and operated by the state, and video lottery, which came into existence in 1989, are one and the same? Although the legislative history was contained in the record below, it has not been argued that rejection of this "video poker" amendment limited the legislature's authority and that the 1989 Legislature exceeded its authority when it enacted the video lottery legislation. If it walks like a duck,

quacks like a duck and looks like a duck, it must be a duck; notwithstanding whatever moniker is hung on it by a subsequent legislature.

If a case can be decided on the merits, this court has consistently deferred from deciding a constitutional issue. *Sheehan v. United Pacific Ins. Co.*, 439 N.W.2d 117 (S.D.1989); *Baldwin v. First Nat. Bank of the Black Hills*, 362 N.W.2d 85 (S.D.1985); *House of Seagram, Inc. v. Assam Drug Co.*, 83 S.D. 320, 159 N.W.2d 210 (1968). The constitutional issue need only be decided if the trial court's factual determination would be that video poker and video lottery are not the same thing.

In conclusion, I would remand this matter to the trial court so the genuine issue of material fact which exists in this case can be ruled upon.